THOMAS PICKERING, Complainant below, Appellant, v. CHARLES H. B. DAY and WILLIAM WHITAKER, sheriff, Defendants below, Respondents.

UNDER the fourth section of the act of Congress in relation to internal revenue, approved July 1st., 1862, the collector of an internal revenue district, is the recognized agent of the government, and is responsible both to the government and to individuals, for all moneys collected and all acts done by his deputy collectors, who are his agents and are alone responsible to him, and he may, or may not, take security from such a deputy for the faithful discharge of the duties of his office, at his pleasure.

Molasses manufactured from Sorghum, was subject to taxation under section 75 of said act and under section 94 of the act approved June 30th, 1864, under the former at the rate of three per cent. *ad valorem*, and under the latter of five per cent. *ad valorem.*

If the collector consents to the use of the public money by his deputy collector in his private business of buying and speculating in grain, it will be a fraud on the sureties of the latter, and will discharge them from their liability on his bond for a defalcation on his .part resulting from it.

The true meaning of the rule established in courts of equity, that an answer which is responsive to the allegations and charges of the bill and contains clear and positive denials thereof must prevail, unless it is overcome by the testimony of two witnesses to the substantial facts, or, at least, of one witness fortified and sustained by corroborative facts and circumstances, is not that the testimony of one witness with such corroborative facts and circumstances is indispensable in all cases. Because circumstances alone may sometimes be found in the answer itself, or in documentary evidence referred to in it, more than sufficient to countervail the denials of it. The rule properly applies to the case of an answer opposed only by the testimony of a single witness. But to have this effect, the witness must not only be competent, but his testimony must be credible, and the corroborative circumstances must materially support the witness and strengthen his testimony, so that when both are considered together, they may be sufficient to satisfy the conscience of the court that the allegations and charges of the bill in respect to the points in dispute are true.

If the language of a statute or the saving clauses in it, are deficient in precision and clearness, or faulty and imperfect in phraseology or structure, the court is bound to give them such interpretation as may appear best adapted to effectuate the object contemplated in the enactment of it ; and if it is obvious that by a particular construction great public interests would be endangered or sacrificed, the court ought not to presume that such construction was intended by the makers of the law.

And giving such a construction to section 173 of the act of June 30th 1864, and the several exceptions and savings and provisos therein con. tained, which declared all of the provisions of the preceding act of July 1st 1862 repealed, but the second, fourth, fifth, one hundred and fifteenth and one hundred and nineteenth sections thereof, neither the office of collector or deputy collector constituted by and filled under the former act, nor the bonds given by them under the same and prior to the passage of the latter act, were terminated, vacated, changed, or altered thereby in any respect, but continued and remained in full force, operation and effect after the passage of the subsequent act. Nor was it necessary for either of them to give a new bond, or new security after the passage of it.

But the giving of any bond by the collector of the district, was not made by either act a condition precedent to his authority to exercise the powers or perform the duties of his office. On the contrary, the provision in question was merely directory to the proper officer of the Treasury Department, and it might be required or waived at his discretion. It is solely intended for the security and benefit of the government, and constitutes no part of the contract between him and his deputy collector and sureties, and his not giving such a bond, can in no way affect their responsibility.

Concealment in the sense in which the term is understood in courts of equity, means the concealment of those material facts and circumstances which one party to the contract, is under a legal or equitable obligation to make known to the other, and which the latter of right and by law is entitled to have communicated to him ; and in relation to the liability of a surety where there has been a defalcation on the part of his principal, the concealment of the fact by the creditor must be active or industrious, and, therefore, fraudulent in its character. Mere passiveness on the part of the creditor, in not enforcing his remedy, will not, of itself, discharge the surety, nor will a failure or neglect on his part, to give notice to the surety of the principal's defalcation have that effect. The creditor under such circumstances, is not bound to anticipate inquiry by disclosure, and may refuse at his pleasure, to proceed against the principal alone for the advantage of the surety, although urged by the latter to do so. Nor is there any decision or rule of law which requires the collector in such a case, to discharge a deputy collector immediately on the discovery of his defalcation, or his sureties will be thereby discharged from their liability. Nothing less than fraud, actual or. constructive, on the part of the collector in such a case, could relieve them from their responsibility.

The correctness of the doctrine that the contract of a surety should be construed strictly, is conceded, if by the term strictly, it is meant that his liability is not to be extended by implication beyond the fair scope of the terms of his contract.

There could be no question that the bond of the deputy collector and his sureties, executed in the month of October 1863 in the penal sum of

$10,000, covered all the taxes assessed and collected under the act of July 1st 1862, whether they were collected before or after the passage of the act of June 30th 1864 ; but whether it extended to taxes assessed and collected under the provisions of the latter act, is a question not material to be considered, as between the collector and the sureties of the deputy collector, if the sureties have settled the matter of the appropriation of the payments on that and upon the second bond executed on the 13th day of October 1864 in the penal sum of $5000, by their indorsements on the bonds, and have provided by their concurrent agreement between themselves, for the final adjustment of their respective liabilities upon them.

The general rule, however, in regard to the appropriation of payments, if there be several debts due from the debtor to the creditor, is that the debtor has a right to direct the application of the payment to which one of them he pleases ; but he must make the appropriation at the time he makes the payment, and cannot do it afterward. If no specific appropriation be made by the debtor at the time of making the payment, then the right of appropriation is devolved upon the creditor, and he may make it as he may think proper, at any time before an account is settled between them, or before action brought, provided such appropriation is not manifestly inequitable in respect to third persons. But if no appropriation be made by either party, then the payment must be applied as the law directs. Where there is a single running account between the parties, in which third persons are not interested, if neither party makes the appropriation, the law will apply the payment to the discharge of the several items of the account in the order of their priority, the first item on the debit side being the item discharged or reduced by the first item on the credit side of it. But where there are intervening equities in favor of third persons, the true doctrine is that the law will apply the payments according to its own notion of the intrinsic justice and equity of the case. And it is now settled by repeated decisions of the Supreme Court of the United States, that where a public officer has given different bonds at different times and with different sets of sureties in them, his payments must be so appropriated, as to give each of his bonds credit for the money respectively collected, due and paid under them.

THIS case came up on appeal from the decree of his honor, Edward Ridgely, Judge *ad litem*, sitting in lieu of the Chancellor who was of counsel for the respondent, Charles H. B. Day, in the cause at the time of his appointment to the office, in and for Kent County, and was heard before Gilpin, C. J., and Wootten, Houston and Wales, Associate Judges.

The appellant had filed in the Court of Chancery in and

for said county, his bill of complaint against the respond-
ents, which stated that under the act of Congress to pro-
vide internal revenue to support the government and to
pay interest on the public debt, approved July 1st 1862,
the defendant, Charles H. B. Day, was appointed Collec-
tor of Internal Revenue for the district and State of Dela-
ware, and appointed on the 3rd day of October 1862 pur-
suant to the act, one John F. Clements of Murderkill hun-
dred in said county, his deputy or assistant collector of
internal revenue for division number 9, of said collection
district, then consisting exclusively of said hundred, by a
commission duly executed under his hand and seal of
office, who thereupon gave bond with security to him as
such deputy collector. He was, however, afterward ver-
bally authorized and directed on the resignation of the
deputy collector in Milford and Mispillion hundreds, to
collect the internal revenue taxes in those hundreds also ;
and who subsequently executed pursuant to his require-
ment, on the 13th day of June 1863, a bond to him in the
penal sum of $10,000 with the complainant, Thomas
Pickering, and Joshua R. Clements, William Smith and
James Green as his sureties therein, the condition of
which was that if the said John F. Clements, being depu-
ty collector of internal revenue for division number 4, of
the collection district of the State of Delaware, should
faithfully and diligently collect all the rates and taxes
which he should according to the duplicate to be issued
to him as deputy collector of internal revenue, be required
to collect, and all taxes whatever which should be com-
mitted to him for collection, and should pay over the
amount of all such rates and taxes at such time or times
and in such manner and form as should be prescribed and
directed by the said Charles H. B. Day, Collector of Inter-
nal Revenue for the district of the State of Delaware ;
and further, if the said John F. Clements should perform
the duties of his office as deputy collector of internal rev-
enue as aforesaid in all things with fidelity, then the
above obligation should be void, otherwise to be and re-

main in full force and virtue ; and to which was annexed
a joint and several warrant of attorney to confess judg-
ment thereon.    After the execution of the bond, Clements
continued to discharge the duties of his office until the 9th
day of August 1865, when the complainant and his co-
sureties were informed by Day that he had failed to pay
over the moneys collected by him under his appointment,
and was a defaulter to the amount of from $10,000 to
$12,000.    That soon after that information was commun-
icated to them, they and Clements met Day at his office in
the presence of Nathaniel B. Smithers and Eli Saulsbury
Esquires, the former as the counsel of Day and the latter a
counsel for the complainant and his co-sureties, who were
called upon and invited there for the purpose of legally
advising them whether the bond last mentioned and exe-
cuted by them as the sureties of Clements, had not been
superseded and rendered nugatory by another bond which
had been subsequently taken by Day from the said John
F. Clements as deputy collector as aforesaid, with the
said Joshua R. Clements and one Daniel L. McBride as
the sureties therein, and in the penal sum of $5000 with
the same condition there underwritten as that above set
forth, and with like warrant of attorney to confess judg-
ment thereon, and that Day then proposed to enter judg-
ment on the said bonds against the said John F. Clements
and to issue execution thereon, but as preliminary thereto,
required that it should be ascertained and agreed between
the respective sureties in them, how the amount of the de-
falcation should be apportioned between the two bonds,
and that the amounts so ascertained and agreed upon
should be indorsed upon them respectively and signed by
the respective sets of sureties in them ; because as he
alleged, it was essentially necessary that should be done,
so that he could issue execution upon them, and that under
that impression the said John F. Clements, the complain-
ant, and his co-sureties signed a written statement indorsed
upon the said bond first above mentioned, that there was
at that time due upon the same the sum of $7,680.38.

That on the following day the said Charles H. B. Day caused judgment to be entered on the last mentioned bond against the said John F. Clements and an execution to be issued thereon, returnable at the ensuing term of the Superior Court, under which the sheriff of the county had levied upon and sold his goods and chattels. But that the complainant and his said sureties had since been informed by the said John F. Clements, and believed it to be true, that very soon after his appointment as deputy collector, finding that the emoluments of the office would not pay him for devoting the time required to the duties of it, being at the time actively engaged in the mercantile business in partnership with one William S. Prouse at Camden in said county, and speculating in the purchase and sale of grain extensively, he informed Day that he was unwilling to retain the office and discharge the duties of it unless he would permit him to use the money collected by him in such business, and that he assented to such use of it ; and accordingly they did use under their partnership name of John F. Clements & Co., the said money as the same was collected by him, in their grain business, and that it was in consequence thereof, their grain business having proved disastrous by reason of the great fall in the prices of it at the close of the past winter and the opening of the succeeding spring, that his defalcation had occurred, and that no defalcation whatever had occured prior to the assent so given by Day to the use of the public funds in the grain business of their firm. That the same was done, however, without the knowledge and consent of the complainant and his co-sureties, and that they were kept in profound ignorance of it both by Day and Clements, and knew nothing of it until after the said indorsement was made and signed by them on the said bond as before stated.

And further, that in the month of July preceding, the the complainant being desirous, as were his co-sureties also, to ascertain whether they were in danger of sustaining any loss by their suretyship for the said Clements, he

called upon Day and requested to know of him whether said deputy was prompt in paying over to him, the money collected under his appointment, and whether he was behind at that time in his payments, when he was informed by Day that he was very little behind, only a few hundred dollars, which greatly relieved the mind of the complainant and also the mind of his co-surety, James Green, when he informed him of it in a few days afterward, and they were, therefore, greatly surprised when they heard of the aforesaid defalcation, following as it did so soon afterward, and they were only the more astonished, as well they might be, to find that at the very time when that representation was made to him, he was indebted to Day on account of such collections, in sum of $11,000, or $12,000, and that he had never been up with his payments since he had commenced using the moneys collected by him in the grain business of his firm as before mentioned, but for months before the time of the said interview, he had been in arrear in large amounts, sometimes as much as $18,000, as the complainant had since been informed. But there was no intention on the part of the complainant to impute to Day any actual design to deceive or mislead him and his co-sureties as to the true state of the account at that time between him and Clements, but he was disposed to attribute it to the regard and friendship entertained by him for Clements, and his unwillingness to expose him by a true statement of his affairs and the condition of his account as deputy collector. Nevertheless, whatever the motive for it might have been, it had the effect to lull the complainant and his co-sureties into a sense of safety and security, and to warrant them in believing that they were in no danger of incurring any loss on account of their suretyship for him. And that their signing of the indorsement on the bond, and of the amount due thereon, as before mentioned, was done because of the representation of Day that it was necessary in order to enable him to issue execution upon the the judgment he then proposed to enter thereon, whilst neither the complainant or his co-

sureties supposed that it would compromise them or their interests in any respect whatever. Wherefore he insisted that under the circumstances then existing (the same having been done without premeditation or time for reflection) they could not justly be held to have waived or relinquished in any respect the benefit or advantage resulting to them in any manner from such erroneous information, but were still entitled in justice and equity to all the benefits and advantages arising therefrom. That upon receiving the information from Clements that Day had assented to his use of the money collected by him, in the grain business of his firm as before stated, the complainant and his co-sureties on consultation with each other and their counsel, concluded to resist the payment of any money on the said official bond of the said Clements as the sureties therein and duly notified Day of the same, whereupon he caused judgment to be entered on the bond in the Superior Court in and for said county against the complainant and each of his co-sureties, and execution of *fi. fa.* to be issued upon the judgment against the complainant, returnable at the ensuing term of the court and the same to be placed in the hands of William Whitaker Esquire, Sheriff, with orders to him to make the money thereon, in pursuance of which he had levied upon the goods and chattels of the complainant and given him notice of his intention to sell the same by the orders of Day to satisfy the execution, and which would be speedily sold unless he could obtain relief in the premises in that court.

The bill of complaint then charged and further alleged that Day by consenting to such use of the public money by Clements in his grain business, without communicating the fact to his sureties, and without the knowledge and consent of either of them, dealt improperly and inequitably by them in the premises, and that the effect of such action and conduct on his part, was to discharge them in a court of equity from all liability upon such bond from the time such consent was given, and that all the money

then due from Clements to Day under it, was collected by the former and used by him and his said partner in speculating in the purchase and sale of grain ; and that the erroneous representation made by Day to the complainant in the month of July 1865, as to the inconsiderable amount then due to him from Clements, misled him and the other sureties and prevented them from taking any steps to protect or secure themselves against the large defalcation then existing on his part, and that by reason thereof they were not bound to make good such defalcation.    That a large part of the money collected by Clements after the date of the said bond, was applied by Day as it was paid over to him, or afterward, to the credit and payment of a previous indebtedness incurred by Clements to him prior to the date of it.    That the sum ascertained, indorsed and signed by the sureties on the bond as before mentioned, was erroneous in point of fact, because Day in making up the account against Clements on that occasion, omitted to credit him with two checks, the one for $225.62 on the Farmer's Bank at Dover, by Clements to the order of Day, dated April 29th 1864, and the other for $2000, on the same bank, drawn in like manner, and dated February 7th 1865, which were credits, and should have been so entered on his said indebtedness as deputy collector.    That as evidence of the understaning and assent of Day to the use of the public funds by Clements and his partner in the grain trade and business of their firm, many of the payments afterward made from time to time to Day by Clements on account of his collections, were by drafts, or bills of exchange drawn by the said John F. Clements & Co. on their factors in Philadelphia and New York, to whom the firm had consigned their grain for sale, which were delivered to Day and by whom they had been negotiated and the money collected upon them, and among which the following were particularly stated and exhibited : a draft drawn by J. F. Clements & Co. on James Barrettt & Son, in favor of Charles H. B. Day for $471.31, dated April 23rd 1863, a draft drawn by the same on James Barrett and in

favor of the same, for $233.80, dated Dec. 5th 1863, a draft drawn by the same on the same and in favor of the same, for $1000, dated Sept. 26th 1864, a draft drawn by the same on the same and in favor of the same, for $1500, dated March 22nd 1865, a draft drawn by the same on B. N. Fox & Co. in favor of Charles H. B. Day, for $3500, dated March 22nd 1865, a draft by the same on the same and in favor of the same, for $2000, dated March 12th 1864, a draft drawn by the same on James Barrett in favor of Charles H. B. Day, for $2100, dated May 19th 1865, a draft drawn by the same on the same and in favor of the same, for $1600, dated June 7th 1865, and a draft by the same on the same in favor of the same, for $1500, dated June 14th 1865. That a portion of the said alleged indebtedness of Clements to Day which he was seeking to recover from the complainant as one of the sureties in the said bond, was on account of rates, duties or taxes collected by him from the manufacturer of sorghum molasses, but which had been collected by him without any authority of law therefor, as it was not subject to any taxation under the act of Congress when correctly construed and interpreted with reference to the matter ; and if there was no law to authorize such a tax, the collection of it was illegal, and the complainant was not liable on the bond for it, and asked for an account from Day of the amount which had been collected from that source, and also for the production of the books and papers containing the accounts between him and Clements, as deputy collector, from the time of his appointment to the filing of the bill of complaint. That after the passing of the said act of Congress approved on the 1st day of July 1862, and the appointment of Day under it as Collector of Internal Revenue for the district of Delaware, and the appointment by him of Clements as assistant and deputy collector as before stated, and the execution of his said official bond to Day by him and his said sureties therein, other acts of Congress had been passed imposing duties and taxes not provided for by any law existing when the said bond was so made and executed

on the 13th day of June 1863, and the collection and pay-
ing over of which additional duties and taxes by the said
Clements, was not in the contemplation of the complain-
ant and his co-sureties at the time they so became his sure-
ties therein, and constituted no part of their contract
thereby entered into with Day, and, therefore, for any
failure or defalcation of Clements in respect to such addi-
tional duties and taxes, they were in no wise responsible
either at law, or in equity. And for this purpose refer-
ence was made particularly to the act of Congress entitled
" An Act to increase the internal revenue and for other
purposes, " approved March 7th 1864, and also to a sub-
sequent act entitled " An Act to provide internal revenue
to support the government, to pay interest on the public
debt and for other purposes," approved June 30th 1864 ;
and that under the act last mentioned, which superseded
and repealed the act approved July 1st 1862, except cer-
tain parts of it thereby continued in force, and under
which parts of it so excepted and continued in force, Day
was appointed to his said office, he had no authority to
collect any duty or tax imposed by said act without a re-
appointment to the said office, and giving bond as required
by the said act, and that consequently he neither possessed
nor could confer, any authority upon Clements as a deputy
collector, to collect any duties or taxes imposed by the
said act approved June 30th 1864, and that Day had never
been appointed to said office, nor given any bond under
the said last mentioned act, required to be given by it, and
since the passage of it, had never appointed Clements dep-
uty collector in conformity with the provisions of it, and
that the greater part, if not the entire amount, of his de-
falcation was for moneys received by him from duties,
taxes and assessments imposed by and under it ; but that
the complainant and his co-sureties were wholly ignorant
of the matters therein last stated at the time when they
signed the indorsement on the said bond as before stated,
admitting that the amount then due thereon was $7,680.38 ;
that Day, however, well knew the same at the time they

so signed it at his instance and request, and that they were not liable on the said bond for that amount, or any other amount whatsoever. The prayer of the bill was for an account between Day and Clements as deputy collector as aforesaid, and for an injunction perpetually restraining Day and the sheriff from proceeding to sell his goods on the said execution, and that the said judgment so entered in favor of Day against the complainant might be decreed to be vacated, annulled and set aside.

The answer of Day was to the effect that he was appointed to the office of Collector of the district after confirmation by the Senate of the United States by commission dated the 4th day of March 1863, during the pleasure of the President, by whom he had been previously appointed to the same by commission bearing date August 11th 1862, and under the authority of it first divided the district and State into twelve collection divisions, appointed an assistant or deputy collector in each of them, and John F. Clements as such, in division No. 9, composed of Murderkill hundred alone, as stated in the bill of complaint, and who thereupon gave bond as such in the penal sum of $15.000, with Thomas Pickering, James Green, Joshua R. Clements, William Smith and Daniel McBride as his sureties therein; and that as such assistant or deputy collector, he had no authority to collect taxes out of that hundred, but was verbally authorized to collect taxes temporarily in division No. 10, consisting of Milford and Mispillion hundreds, on the resignation of the deputy collector of that division on or about the 1st of April 1863, but that he collected and fully accounted for, out of the moneys received therefor by him, all the taxes to be collected by him in both divisions, up to the 1st day of October 1863, and thereby relieved his said sureties of any liability for or on account of them upon that or any other bond. That on the day last stated in pursuance of power vested in him as Collector of Internal Revenue in it, he reorganized the district into six, instead of twelve divisions, two in each county of the State, and consolidated the two previous

divisions, Nos. 9, and 10, into one division called No. 4, comprising the hundreds of Murderkill, Milford and Mispillion, as before mentioned, and appointed the said John F. Clements deputy collector of it, and a new deputation or letter of appointment was issued to him under his hand and seal of office of the same form and tenor as that which had been previously issued to him for division No. 9, and set out in complainant's bill of complaint, except as to the date of it, the number and division, and that in it he was named deputy collector, instead of assistant collector, the former being the term by which such officer was designated in the act of Congress; and upon his new appointment as deputy collector of division No. 4, required of him to execute a new bond with sufficient sureties for the faithful performance of the duties of the office, and thereupon he, with the said Joshua R. Clements, William Smith, James Green and Thomas Pickering as his sureties, executed and delivered to him their joint and several bond in the penal sum of $10,000 with condition thereunder written and warrant of attorney to confess judgment thereon thereunto annexed, as set forth in the said bill of complaint, except as to the date of its execution, which was erroneously stated in the bill of complaint, but which was in fact some time between the first and twentieth day of October 1863, instead of the thirtieth day of June 1863, as improperly stated in the bill of complaint, and which was before any tax lists were issued to him, or any taxes were collected by him as deputy collector of division No. 4, but was not until after the 1st day of October 1863, when the district was reorganized into new districts as before mentioned, and he had been appointed deputy collector of division No. 4; and which was executed by him and his sureties therein to secure the proper collection and payment of the internal revenue in said division, and for the faithful discharge of his duties as deputy collector of it, and that it was the same bond on which the judgment mentioned had been entered in the said Superior Court against the complainant. That upon his appointment and the execution and

delivery of said bond, Clements entered upon the discharge of the duties of his office as deputy collector of division No. 4, and continued therein until the 15th day of July 1865, when he was removed from it, and was notified of his removal, but no list of taxes had been transmitted to him after the 13th day of June 1865, and no collections had been made by him since the 15th day of July in the same year, on which day his authority as deputy collector ceased, and after which day no returns were made by him ; and that the amount of his indebtedness as therein after stated and agreed to by him and his said sureties, was ascertained upon the basis of the taxes collected and lists returned by him prior to that date.

That on the 9th day of August 1865. Daniel L. McBride, who was one of the sureties of Clements as deputy collector of internal revenue in said division No. 4, in another bond to Day in the penal sum of $5,000, with a condition thereunder written of the like form, tenor and effect, and with warrant of attorney to confess judgment thereon annexed, met the latter on the street in Dover and inquired of him whether Clements was not very much behind in his payments, to which Day replied that he was, and if he would accompany him to his office, he would inform him of the precise amount as then shown by his official books and accounts, to which McBride assented, and where he exhibited to him the account of Clements in his ledger, and gave him a written statement of the balance due as appeared from the books, balanced as of June 30th 1865, and which amounted to the sum of $11,520.57, upon which McBride inquired of him what he should do, when Day advised him that he should see Clements and his other sureties, and that they should all meet him at his office at 1 o'clock P. M. the next day, to which he assented, and the next day Clements with all the sureties in both bonds, met him at his office, and upon his being informed that they were present for the purpose of endeavoring to arrange the matters between Clements, his sureties and himself, they proceeded to a private room where he exhibited the state

of the accounts of Clements, and the two bonds in which he and his sureties were bound to him, and which account Clements then and there admitted to be correct. The complainant Pickering upon the exhibit made, then inquired of Clements what he proposed to do, to which he replied that the matter was with him, he was broke and could not pay, and tendered a bill of sale from himself and partner to Day for three-fourths of a vessel and requested him to accept the same at the price of eighteen hundred dollars, and to credit him with the amount on his account, and also stated that his partner had assigned to him his interest in their partnership effects and books of the firm and requested Day to take from him an assignment thereof, collect the debts and convert the property into money and to apply the same to the payment of the amount due from him as deputy collector, and if there should be any surplus, to pay it to his other creditors; to which Day replied that he was doubtful as to the legality and propriety of it, and that he was safe on the bonds, and suggested that if there was to be any such conveyance or assignment, it had better be made to one of the sureties, as they were the parties most interested in such an arrangement, whereupon it was agreed by common consent that Nathaniel B. Smithers Esquire should be sent for to advise concerning the legality and propriety of making such an assignment, and generally as to what course had better be taken in the premises, but who upon his arrival and consultation on the subject, expressed a doubt whether the contemplated arrangement would not be interfered with by the firm creditors in the prosecution of their claims, when it was suggested by one of the sureties, and by Pickering, or Green it was believed, that Day should enter the bonds against Clements, the principal, and proceed by execution to secure whatever of his property could be reached. But in the conference there was a difference of opinion manifested among the sureties themselves, as to their relative liability upon the two bonds, the sureties in the first being inclined to think that it had been superseded by the

taking of the latter bond for $5,000, which was on the 13th day of October 1864, whilst McBride, one of the sureties in the latter, suggested that it was additional only to the other, and that the amount of the penalty of the former should be paid by Clements and his sureties in it, before any liability for his defalcation could lawfully or rightfully accrue against the sureties in the latter bond, and inquired of Mr. Smithers his opinion upon that point, who declined, however, to express any, and suggested that the sureties should immediately procure counsel to advise them in relation to their special and respective interests in the matter, when the complainant and Pickering left and soon returned with Eli Saulsbury Esquire as their counsel, who expressed the opinion on the same question when it was propounded to him, that the former was not superseded by the latter bond, but that Day had the right and authority to take the latter as further security for the faithful collection and payment to him by Clements, as deputy collector of division No. 4, of all the duties and taxes put in his hands for collection in the division after the execution and delivery of that bond to him, without in any way impairing the obligation or effect of the former bond taken by him. Whereupon the sureties again united in the request that Day would for their benefit and advantage enter both of the bonds against Clements, the principal, and issue executions upon them, which he was desirous of doing in order to diminish as much as possible, their ultimate liability for his failure and defalcation, by the collection of as much as could be obtained from the property and effects of Clements alone; but as the amount of the defalcation exceeded $10,000, the penalty of the former bond, or of either of them separately, he replied to them that it would be proper for the sureties to agree among themselves as to the amount which should be collected on them respectively, to which there was no objection expressed by either of the sureties or their counsel, and thereupon it was agreed by them that the amount of the defalcation should be divided and apportioned between the two bonds in the same pro-

62

portion which their penal sums respectively bore to each other; with the further understanding and agreement among themselves, that the question as to the amounts in which they should contribute to the payment of it among themselves respectively should be submitted to amicable arbitration, and that the questions which might arise in considering that matter, whether the sureties in the former bond were liable for any taxes other than those which were assessed at the rates prescribed by law at the time when it was executed, and whether the sureties in the latter bond were liable in a *pro rata* amount with the sureties in the former, or whether the latter was not taken as an additional security merely, and the sureties therein only liable for the amount which remained unpaid after applying the penalty of the former, should be specially referred to arbitration. And that instead of the complainant and the other sureties being ignorant of the fact that a large portion of the defalcation of Clements was for taxes and duties other than those which were assessed at the rates prescribed by law when the former bond was executed, they were on the contrary well aware of it, for the whole matter had been discussed on that occasion by the sureties, and the proposition of their exemption from liability on that ground, was distinctly understood and considered by them, and the reference of that matter was specially agreed to by themselves, as between each other, and the conclusion was then definitely arrived at by them, that they would agree to the amounts which should be collected by Day on the said respective bonds absolutely, but as among themselves, that the matter of contribution and their ultimate liability as between themselves should be referred as before stated; and upon such agreement among themselves and at their request, Mr. Smithers made the calculation and found on the basis agreed upon by them, that the amount to be collected on the former bond in the penal sum of $10,000, was the sum of $7,680.38, and on the latter in the penal sum of $5,000, the amount to be collected was the sum of $3,840.19; and thereupon Day indorsed

the following agreement upon the back of the latter bond;
" Aug. 10th 1865. We agree that the true amount due upon
this bond is the sum of three thousand eight hundred and
forty dollars and nineteen cents with interest, from June
30th 1865.    Witness our hands and seals," and which was
signed and sealed by the parties thereto, John F. Clements,
Daniel L. McBride and Joshua R. Clements, and also the
following agreement upon the back of the former bond;
" Aug. 10th 1865. We agree that the true amount due
upon this bond is the sum of seven thousand six hundred
and eighty dollars and thirty-eight cents with interest from
June 30th 1865.    Witness our hands and seals," and which
was signed and sealed by the parties thereto, John F.
Clements, Joshua R. Clements, William Smith, James
Green and Thomas Pickering, the complainant; and im-
mediately afterward Mr. Smithers by the request of the
complainant and the other sureties on both bonds, and in
their presence and the presence of their counsel, proceed-
ed to prepare and draw a written agreement between the
said sureties to refer the questions before stated, and all
others arising between the said sureties as among them-
selves, to Eli Saulsbury and Nathaniel B. Smithers, with
power in case of disagreement between them, to call in a
third person as umpire, and to abide and perform the
award of them, or a majority of them in the matter, and
which was duly signed, sealed and executed by each of
said sureties.

It was also stated and admitted in the answer that on
the 10th day of August 1865, Day caused judgment to be
entered, as alleged in the bill of complaint, on the bond
for the penal sum of $10,000 against John F. Clements,
and the writ of _fi. fa._ to be issued thereon for the sum
of $7,680.38 with interest from June 30th 1865 and cost,
and that by virtue thereof the said sheriff had levied up-
on his good and chattels and since sold the same, but
that the same was done at the earnest request and so-
licitation of the complainant and the other sureties, and
with the entire approbation of Clements himself in or-

der to procure the first lien upon his goods and to secure as much as possible out of his estate in advance of his other creditors; but that he refrained from entering either of the bonds against the sureties until he was informed by their counsel that they intended to resist the payment of them, and who at the same time suggested to him that he should proceed against one or more of them, so that the question of their liability upon them would be settled, and in pursuance of which he caused judgment to be entered severally on them in the said Superior Court against all the sureties, and caused execution thereon to be issued against the complainant, Thomas Pickering, and against the said Daniel L. McBride, returnable to the October Term 1865 of said court, and directed that against the complainant to be placed in the hands of the said sheriff with instruction to levy and make the money ordered by the said writ to be collected, which was the sum of $7,680.38, with interest from June 30th 1865 and costs; and that the said sheriff was proceeding to collect the the same when he was stayed by the said injunction of the court below.   Also that it was true, as alleged in bill of complaint, that after his appointment as Collector of Internal Revenue for the District of Delaware, and the appointment of said Clements as deputy collector for division No. 4, and whilst they were each holding and exercising their said offices respectively, and after the execution of the said bond in the penal sum of $10,000 by him and the complainant and the other sureties therein, each of the said acts of Congress referred to in the bill of complaint, were passed and approved on the several days respectively stated in it, by virtue of which the rates and duties upon divers articles were changed and modified, and other and different rates and duties were imposed, levied and assessed upon such articles, than were imposed, levied and assessed at the time of the execution of the said bond; but that such change having been made by the proper legislative authority in the exercise of its legitimate functions in pro-

viding revenue for the support of the government, it had no effect to discharge the said Clements or any of his sureties therein from their liability upon it for the faithful performance of the duties and obligations imposed upon him by it. And that it was true that he had not been reappointed Collector of Internal Revenue, nor had he received any new deputation or executed any new official bond as such, nor had he issued any new authority or deputation to the said Clements, or taken or required any new bond from him as such deputy collector, after the passage of the act of Congress of June 30th 1864. But that under the provisions of the several acts of Congress providing for regulating the collection of Internal Revenue, no such new appointments, bonds, and deputation were necessary, and would have been improper. That the whole amount of lists of taxes and duties assessed and issued from his office to Clements to be collected from the commencement to the close of his service as deputy collector, was $26,510.04, and the amount received by him in duplicate returns was $3,548.71, the said duplicate returns embracing taxes on distributive shares, legacies, successions, gross receipts of vessels, stage coaches, distilled spirits, and the ten per cent. penalties, and which duplicate returns were not issued from his office, but were returned by Clements, as the deputy collector, to the office and from which returns he was charged therewith, there being no other official account in his office in regard to them; and that of the said sum of $26,510.04, the sum of $1,295.95 was issued to him as deputy collector of division No. 9 and 10, and the sum of $25,214.09 was issued to him as deputy collector of division No. 4, and of that amount the sum of $11,916,13 was issued to him as taxes assessed under laws existing prior to June 30th 1864, the act of March 7th 1864 having relation solely to taxes on liquors so far as it had any application to the district of Delaware, and under which act there was no tax on liquor in his hands, and the residue thereof, being the sum of $13,297.96, was issued to

him as taxes assessed under the provisions of the act of June 30th 1864, and subsequent enactments. That of the amount of $3,548.71 returned by him in duplicate returns, the sum of $6.42 was returned by him as deputy collector for divisions No. 9 and 10, and the balance of it, as deputy collector of division No. 4, and all of which went into his hands after the passage of the act of June 30th 1864. That lists of taxes and duties levied upon persons and articles subject to tax and and duty subsequent to the last mentioned date, were placed in his hands for collection, to the amount of $16,840.25, including duplicate returns, of which amount he returned as collector, the sum of 16,740.20, and as uncollected, the sum of $100.15, of which the sum of $73.12 was abated as uncollectable, leaving $27.03 as uncollected, but of which it was subsequently discovered that $10.00 had been collected by him, and which formed a part of the $790 hereinafter mentioned. And that the sum of $11,520.57 indorsed on the said bonds as before stated, comprised the whole indebtedness of the said Clements of which he then had any knowledge or information, but at that time he had in his hands duplicate returns on which he had collected money to the amount of $780, but which had never been returned by him, and also the said sum of $10, before referred to, and which sum of $790, he afterward discovered had then been collected by him on application to the persons against whom the said taxes and duties were assessed; and deducting therefrom his commissions on the same, amounting to $277.82, it left the sum of $512.18 to be added to the said sum of $11,520.57 then ascertained and indorsed thereon.

That among the taxes issued to him for collection as deputy collector of division No. 4, was the sum of $2,010.60 assessed upon manufacturers of molasses produced from sorghum, of which the sum of $258.41 was assessed prior to June 30th, 1864, and the residue of it, $1752.20, subsequent to that date, but of which latter amount the sum of $21.42 was abated to the manufacturers, the whole

of which with the exception of said abatement, was received by him as deputy collector, and was included in his general returns and formed a part of his general accounts; no tax, however, upon sorghum manufactured after March 3rd 1865, was placed in his hands. And that he had authority under the acts of Congress referred to, and was specially directed and required to collect such tax or duty by a decision of the Commissioner of Internal Revenue contained in a circular issued from his office and received by him. That on all the lists in the hands of Clements for collection and all the lists returned by him, and on which he was in arrears, adding the aggregates of them together, there was an apparent indebtedness on his part, as of March 31st 1865, of $18,145.04 a large portion of it, however, was for lists still in his hands and then unreturned by him; but adding to the amount of $11,147.59 which was found to be the amount in which he was indebted, as of January 1st 1865, as before mentioned, and all of which had accrued before he, Day, had any intimation or suspicion that he or his firm was using the money in the purchase of grain, the sum of $1,896.87 which was shown by his receipt books to have been received by him prior to the said last mentioned date, and then in his hands, but not returned by him as having been collected up to that date, and not included in the said sum of $11,147.59,there was exhibited in his hands, as of that date, a cash indebtedness of 13,044.46, and which was a greater indebtedness than that which appeared and existed on the said 10th day of August 1865. That he, Day, had from time to time received drafts from the firm of John F. Clements & Co. on their factors in Philadelphia and New York, in payment of collections made by Clements as deputy, as alleged in the bill of complaint, but he expressly denied that he then had any knowledge of the fact that, either Clements or his firm, was using the moneys collected by him as deputy collector in the purchase of grain consigned for sale to such houses, or that he ever assented to, or approved of the use of the money by him in any such manner; but as

a matter of choice for his own convenience and accommodation, he preferred drafts to payments in money when satisfied that they were good and would be promptly paid, and generally took them, not only from him, but his other deputies, as it saved him the risk of losing the money in taking it to Philadelphia where he made his own payments to the Assistant Treasurer of the United States in that city. That Clements never said to him that if he could not be allowed the use of the money so collected by him in his purchase of grain, or in any other business, he would be obliged to resign the office of deputy collector; on the contrary, he had informed him when he complained that the compensation was inadequate, that he was willing to accept his resignation at any time, though he did not wish to remove him, and that he had afterward applied to him through another person to voluntarily resign it, but which he declined to do. He also denied that Clements was entitled to any credits other than those which were allowed at the time of ascertaining the aggregate amount due from him, and endorsed on the said bonds; and alleged that the two checks from him to his order on the Farmers' Bank, the one for $225.62 and the other for $2000, had no connection whatever with their official accounts or transactions, but that the first was for a bill due from him, Clements, to a party in Philadelphia and placed in his hands for collection, and which he so paid to him, and the latter was for that amount of money loaned to him on the 17th of January 1865, and which was afterward repaid to him by the said check on the day of the date of it, February 7th 1865. Or that he had any knowledge or suspicion that Clements or his firm was using the money collected by him in the purchase of grain until about the 1st day of February 1865, when the books having been balanced, as of the 1st day of January preceding, and his accounts brought up to that date, so far as his returns were then made, it was discovered that he was due him for taxes collected $11,147.59, and that there were then in his hands unreturned lists containing taxes to the amount of $1,174.81,

when he at once addressed to him a peremptory order to immediately pay the amount; and that after the lapse of some days Clements called at his office and on being urged by him to pay it, he replied that he could not, that his funds were locked up in grain, and navigation was closed, but as soon as he could get his grain to New York, he would pay it, and upon expressing his disapprobation and dissatisfaction in regard to such use of the money by him, and telling him that he had no right to do it, he replied that he knew he ought not to have so used it, but if navigation had not closed, he would have been able to pay it by the time he returned his lists, and as soon as it opened he would dispose of his grain and pay it; and in a subsequent conversation on the subject with the clerk in the office, said that if the navigation had not closed, he, Day, would never have known that he had so used the money. He also denied that after his discovery of the fact that Clements had been so using the money, he ever concealed, or sought to conceal the knowledge of it from the complainant, or any of the sureties in the said bonds, or that he ever said to the complainant at or about the time stated in his bill of complaint, that Clements was not much behind in his payments to him—only a few hundred dollars; but in the latter part of May, or in the early part of June 1865, and before the 7th day of the latter month, he met the complainant on the street of Dover, when the latter inquired of him if Clements was up with his payments, to which he replied to the best of his recollection, that he was not, but he had promised to return his lists and make his account good by the 15th day of June, and denied that he ever had any other or further conversation with him on the subject until the meeting on the 10th of August 1865, as before stated, or ever made any erroneous representations to, or withheld from the complainant or any of the other sureties any information concerning the state of the accounts of Clements as deputy collector as aforesaid; but that he was, on the contrary, at all times ready and willing to give any

63

and all the information he possessed in regard to the matter, and that in all his dealings and transactions with them, he had acted in entire good faith toward them, and that all his proceedings in the premises had been at their instance and request and for their benefit and advantage. And he further denied that any of the money collected on lists issued to him subsequent to the execution of the $10,000 bond by him and his sureties, were applied to any indebtedness of Clements incurred prior to the date of it, and stated particularly how the payments made by him were applied. To the answer was annexed a sworn copy of the accounts in question taken from the ledger and day book of his office.

The decree in the court below dissolved the injunction previously issued in the case, and dismissed the complainant's bill of complaint with costs, the reasons for which, as well as the facts proved and the evidence on which it was founded, will sufficiently appear from the exceptions taken to it, the argument of counsel in the case, and the opinion of this court confirming it in all respects.

*Eli Saulsbury*, for the appellant.   Whatever may have been the original liability of Clements on his official bonds as deputy collector, he was completely discharged from it by the consent of Day to his use of the public money collected and received by him as such in his private business; and especially, in such a precarious, and hazardous business, as speculating largely in the buying and selling of grain by which in a few months he was utterly bankrupted and ruined.   His answer, it was true, expressly and directly denied that he had ever consented to, or had any knowledge or suspicion of it until about the first of February 1865; but the positive and direct testimony of Clements himself to that fact corroborated by the fact admitted by Day, that he was receiving from him from time to time previous to his failure or embarrassment, numerous drafts for large sums of money on his factors or consignees of grain in Philadelphia and New York, was sufficient to prove and establish it, notwith ·

standing the denial of it in his answer.   He was suffi-
ciently acquainted with Clements, his business and his
means and resources, not only to suspect, but to know
that he he could not be engaged so largely in buying
and shipping grain to such markets, and in drawing so
many drafts for such amounts against it, to pay him for
moneys received by him as deputy collector, without
his having used such money in the purchase of the grain
and in such private business; and by accepting such drafts
from him, he not only enabled him to make such use of it,
but with the knowledge that he was so using it, he thereby
gave, at least, his implied assent to it, and it might properly
have been so considered and regarded by Clements.   The
drafts could not be used by him in making his own pay-
ments into the Treasury of the United States, because no
such paper could be received by any Assistant Treasurer,
and they were consequently used by him only for the pur-
pose of collecting the money due to him from Clements at
the bank in Dover, and where the amounts for which they
were drawn, were never credited to him until after they
had been duly honored and paid in Philadelphia or New
York.   He also violated his official duty in withholding
from the appellant correct information on the subject of
Clements indebtedness to him and the true state of his ac-
count, when in June or July 1865, the appellant inquired
of him in regard to that matter, and when he was in reply
informed by him that he was not much behind—only a
few hundred dollars, and when he well knew that he was
then a defaulter to a large amount, which he could never
pay, much less, in fifteen days from that time; and which
amounted in equity to a wilful and fraudulent concealment
and misrepresentation of a material and important fact in
the case, as the effect and design of it could only have been
to mislead and deceive the appellant and his co-sureties,
and to lull them into a false and delusive sense of security
and safety as to the actual liability and heavy loss already
incurred and sustained by him and them, which would in-
validate the contract of suretyship between them and re-

lease them from any liability for such loss. 1 *Story's Eq. Juris.* sec. 324. *Hill on Trustees* 148.

That after the passage of the act of Congress approved July 1st 1862, and the appointment of Day as collector of the district and his giving bond as such under it, and his appointment of Clements as deputy collector of division No. 4, and the execution of his bond to him in the penal sum of $10,000, with the appellant as one of his sureties in it, which was done on the 13th day of June 1863, other acts of Congress, and particularly the act approved on the 30th of June 1864, were passed on the same subject, greatly increasing the duties and taxes imposed by the first act under which they had been appointed and given bond as just stated; and that it appeared from the accounts which had been exhibited, that the greater part, if not the whole amount of the defalcation in question, was for moneys collected by Clements under the later act, and that he had collected and fully accounted for and paid over all the duties and taxes for which he was liable up to the 1st day of October 1863, and, therefore, the appellant and his co-sureties in the bond were thereupon discharged from any liability for such defalcation. But if there had been any balance of indebtedness resting against him for collections made prior to the passage of the act of June 30th 1864, any collections and payments made by him afterward, even in the absence of any directions from Clements as to the application of such payments, should have been applied and appropriated to such antecedent collections. *Clayton's Case,* 1 *Mer.* 572. Where there are running accounts between parties consisting of various items of debit on one side and of credit on the other, and neither the creditor or debtor has appropriated the payments to any particular debit, the law will apply them to the debits oldest in time in the order in which they stand in the account; and this rule applies in such a case, when there are distinct sets of sureties interested in the appropriation of such payments. *Dows v. Morewood,* 10 *Barb.* 184. *United States v. Kirkpatrick,* 9 *Wheat.* 720. *Boston Hat Man. Co. v. Messinger,* 2

*Pick.* 238. *Pierce, Clark & Co. v. Knight*, 31 *Verm.* 701. *Postmaster General v. Furber et al.* 4 *Mason* 333. *United States v. Wardwell et al.* 5 *Mason* 82. *Speak v. Commonwealth*, 3 *Watts & Serg.* 224. And the debtor has a reasonable time to direct the appropriation after the payment is made, but if the creditor has communicated the account after making the appropriation of the payment, and he assents to it, he cannot afterward change it. *Allen v. Culver*, 3 *Denio* 284. *Stone v. Seymour*, 15 *Wend.* 33.

And although the act of June 30th 1864, may have continued in office all collectors and deputy collectors before appointed under the original act of July 1st 1862, the contract of the surety by virtue of the bond, was only as to the law in force in regard to their official duties at the time when it was executed, and if their duties or liabilities were afterward materially varied or incr ased by the subsequent act, the surety would not be responsible for the breach by his principal of any new duty or increased liability under it. *Ld. Arlington v. Merick*, 2 *Saund.* 412. *Mayor of Berwick v. Almack*, 16 *E. C. L. R.* 236. *Pydus v. Gibbs et al.* 38 *E. C. L. R.* 57. *Bonner v. Mac Donald*, 1 *Law & Eq. Rep.* 1. *United States v. Kirkpatrick*, 9 *Wheat.* 720. *Miller v. Stuart et al.* 9 *Wheat.* 681. *Banford et al. v. Illis.* 3 *Exchg. Rep.* 380. Although the officer may be the same, if there is an alteration or change in the nature or duties of the office, the surety will be discharged. *Boston Hat Man. Co. v. Messinger*, 2 *Pick.* 235. *Purcell v. Summersett*, 4 *Taunt.* 593. *Liverp. Water Works Co. v. Atkinson*, 6 *East* 507. *Mayor and Council of Wilmington v. Orne*, 2 *Harr.* 190. It was furthermore rendered thereby necessary for the collector Day himself to execute another or new bond with sureties, to lawfully qualify him to enter upon the new and increased duties of his office under the act of 1864; for the giving and approval of such a bond was a condition precedent to his legal qualification for the discharge of such increased duties and responsibilities. *Thomas v. Owen*, 4 *Maryland* 189. *Bruce et al. v. Love*, 11 *Gill & Johns.* 382. *Foster v. Just*, 9 *Georgia*

185. *Rounds v. Mansfield*, 38 *Maine* 586. *Rounds v. Bangor*, 46 *Maine* 541. *United States v. De Baron*, 19 *How*. 73. *Commonwealth v. Slifer*, 25 *Penna*. 23. *State v. Bullett*, 30 *Miss*. 624. *Eaton v. White*, 2 *Wiscon* 292. *Olney v. Pearce*, 1 *R. I.* 292. *Smith v. United States*, 2 *Wal*. 219. The various provisions of the act of 1864 upon the subject, and which should have been complied with before such a collector could legally enter upon the performance of the duties of his office under it, were not directory in their character merely, or such as to clothe the Secretary of the Treasury or the Commissioner of Internal Revenue with discretionary authority simply to determine whether a new bond should be required of him, or not. The number of sureties prescribed for it, as well as other special provisions of the act, clearly precluded such a presumption or construction of them. Nor was the appellant estopped to deny that he had authority to collect any of the taxes in question, by uniting in a bond to him as collector with Clements and his co-sureties. *Nares et al. v. Rowells*, 14 *East* 510. *Kepp et al. v. Weggett et al.* 1 *Law & Eq. Rep*. 365. *Austin v. Thompson*, 45 *N. H*. 113.

Nor would a proper construction of the ninety-fourth and ninety-sixth sections of that act warrant any tax upon the article of molasses manufactured from sorghum, because they did not, and were not designed to include it among the commodities specified in them as subject to taxation. Nor could it be maintained that the sureties in either of the bonds referred to, were concluded from raising or availing themselves of any of the questions which had been presented as to their liability for any part of the defalcation of Clements, by the ascertainment of the amount of it on the 10th of August 1865, and the indorsement of the respective proportions of it on the back of the two bonds under their hands and seals respectively. All the evidence in regard to it showed, and the answer itself admitted, that it was persistently pressed and demanded by Day as absolutely necessary to enable him to enter judgments on the bonds severally against Clements, the prin-

cipal obligor in them, and to issue execution thereon forthwith against him alone, so as to obtain an immediate lien on all his personal property ; and as such were the best and the only terms which could be obtained from him by them under the circumstances, and as it was certainly important and desirable to them that they should procure that much, at least, for their ultimate benefit and relief in the premises, they were obliged, of course, to assent to and acquiesce in it. The sole object, therefore, of the arrangement and agreement to ascertain and indorse upon the bonds the proportions in which the two sets of sureties in them should be relatively and respectively liable for the amount of the defalcation, was to obtain judgment and execution immediately upon them for the respective amounts indorsed on them against Clements alone, as the best and only thing that could then possibly be done for the sureties under the circumstances. It was not, however, indispensably necessary, nor in any degree necessary for any such purpose, although uniformly so represented and insisted upon both by Day and his counsel; and it would consequently be unjust and inequitable to allow him to take advantage of the indorsements and acknowledgments which they contained, for an entirely different purpose and object which was certainly not contemplated or apprehended by them, at least, when they affixed their signatures and seals to them respectively, or to conclude and estop them from thus qualifying and restricting the effect of such admissions, or to fix and establish their legal liability for such defalcation to the effect and extent now contended for by him. In general, a court of equity will not relieve against a mistake or misapprehension of law merely, but where the parties have been guilty of a mutual mistake in that respect, or as to their respective legal rights or liabilities in regard to the matter in question between them, a court of law, even, will relieve against it, or so far avoid the error as to prevent injustice from resulting from it to either party. *May v. Coffin,* 4 *Mass.* 342. *Warder et al. r. Tucker,* 7 *Mass.* 449. *Freeman et al. v. Boynton,* 7

*Mass.* 483. And a court of equity would do the same, of course, 1 *Story Eq. Juris.* secs. 122, 134, 155. The point last made and the principle stated in it proceeded upon the assumption that Day, as well as the sureties, was at the time when the indorsements were so made on the bonds, entirely ignorant of the change and effect which the passage of the act of Congress of June 30th 1864, had produced in and upon the legal relations, rights and liabilities before that subsisting between him and them as the sureties of Clements. In such a case of surprise on their part in the sudden discovery of a large defalcation on the part of their principal, and not apprehending or contemplating the legal effect now claimed for the indorsements on the other side, and both they and Day being alike under a mutual mistake and misapprehension as to the legal effect which the subsequent passage of that act had produced on their previous relations and liabilities, a court of equity would relieve against it. *Willin v. Willin,* 16 *Ves.* 72. *Hill on Trustees* 149. *Northrop v. Graves,* 19 *Conn.* 548. *Burr v. Veeder,* 3 *Wend.* 412. *La Mott v. Bowlcs* 6 *Harr. & Johns.* 500. *Gillespie v. Moon,* 2 *Johns. Ch. Rep.* 585. And even if a party has the means of knowledge, or of ascertaining the matter in question, the rule was the same if the mistake or misapprehension actually existed at the time. *Ch. on Contr.* 548, 643. *Kelley v. Solari,* 9 *M & W.* 54. *Bell v. Gardner,* 43 *E. C. L. R.* 16. *Waite v. Legget,* 8 *Cow.* 195. *Weeden v. Roll,* 20 *Wend.* 174. *Stedwell v. Anderson,* 21 *Conn.* 139. In most of the cases just cited, it would be observed that the mistake in question occurred in the payment of money not lawfully or rightly due. But if, on the contrary, Day then had knowledge of the effect which the act of 1864 had on the relations and liabilities previously subsisting between him and his sureties, and withheld it from them, it would have constituted an actual and positive fraud on his part in the transaction, against which a court of equity would be bound to relieve. The sureties were also ignorant at the time the indorsements were made upon the bonds, that Day himself had

not given any new official bond after the passage of the act of Congress of June 30th, 1864, and that he had not even been reappointed to the office of Collector of the district after the passage of it. Also of the fact, that Clements had been using the public money in his private business and in the purchase and shipment of grain to Philadelphia and New York, and that Day had either assented to such use of it, or received drafts from him on his commissions merchants in those cities to whom it was consigned for sale, in payment of sums due from him as deputy collector, and that they had thereby been discharged from their obligation of suretyship on the said bonds ; and furthermore that they did not know, and could not know, except as it was then represented and shown to them by Day and the admissions of Clements, what amount was due from the latter to the former on account of his collections as deputy collector, and therefore they did not, and could not have intended by such indorsement or acknowledgment, to admit any such matter of fact of which they then had no knowledge or information whatever.

*Smithers*, for the respondents. A mere increase of risk, or superadded duties to the office of Clements as deputy collector, did not absolve his sureties from their liability, unless they went beyond the fair scope of the contract of suretyship. *Bank of Wil. & Brand. v. Wollaston*, 3 *Harr*. 90. It had been clearly shown and established that the indorsements on the bonds and the written agreement among themselves to refer all questions as to the respective liability of the two sets of sureties in them for the defalcation to the arbitrators mentioned, executed under their hands and seals, were made after seven hours of careful consideration, and could there be any ground or pretext for saying that they were misled or deceived in regard to the matter ? That was directly met and expressly denied in the answer, and until the denial of it was refuted and disproved by the positive testimony of two witnesses, or of, at least, one witness, supported and sustained by corrobo-

rating circumstances, the answer on that point was con-
clusive.  *Maddock v. Sullivan*, 2 *Rich. Eq. Rep.* 6.   The
facts detailed and proved showed that when they first met
in company with Clements in Day's office on the occasion
referred to, they had, at least, some hopes that his property
and effects might be sufficient to meet his indebtedness,
but after the books and accounts had been exhibited to
them with the amount of his defalcation as it then appeared
by them, and they had discovered that such a hope was
groundless, and that it was even doubted by Day whether
he would be safe in taking any assignment of his partner-
ship property or effects for their benefit and relief in the
premises, they became concerned and anxious for them-
selves in particular; and the question at once arose between
them as to the relative liability of the respective sureties
on the two bonds for the amount of it, each set being so-
licitous, of course, to avoid as much of it as possible.
And it was a difficult, as well as a hazardous thing for
the obligee to undertake to apportion the loss between
them without their sanction and consent ; but it was after-
ward done with their entire approbation and consent, and
not only after mature consideration and deliberation, but
with the advice of counsel on their part.   It was at their
special instance and request, and for their benefit and
advantage that judgments were entered upon the bonds
at once against Clements alone, and executions were
issued thereon ; and when urged to do so, Day's uniform
reply was that as the amount of the indebtedness or defal-
cation was larger than the penal sum of either of them,
unless they would agree to the apportionment of it between
them, and the two amounts for which the respective exe-
cutions should issue against him, he would take his own
time for doing it, as he could himself rest safe with the
security he had, and would simply enter judgment there-
on against each and all of them, and there rest the matter.
But the understanding and arrangement between the par-
ties was not for the purpose simply of having a judgment
entered and an execution issued without delay against

Clements alone, but it was designed by all of them to go beyond that, and to accomplish just what the language of the indorsements necessarily and directly imported, and which was also expressly indicated and admitted in the written agreement between the sureties themselves which was made and executed at the same time, and which constituted a part of the same transaction and arrangement in regard to the matter, although Day was not a party to it in form, and was in no manner affected or concluded by it.

As to the tax on molasses manufactured from sorghum, it was authorized by the internal revenue act of 1862, *sec.* 72, *page* 75, *sec.* 7, *pages* 33, 35, and was afterward subject to a tax of five per cent. *ad valorem* under the act of 1864, *sec.* 94, *pages* 50, 51, 52, and under the general taxing clause of it, *sec.* 93, *page* 57, and was not embraced in the free list prescribed in it, *sec.* 96, *page* 60, but was exempted from taxation by the act of 1865, *page* 12, and was included in the free list of the act of 1866, *sec.* 91, *page* 51, and under the act of 1867, which exempted molasses generally, *sec.* 11, *page* 6, whilst the tax under the preceding acts of 1862, and 1864, had been collected upon it pursuant to the instructions of the Secretary of the Treasury which was binding on such officers, *page* 173. The indorsements on the bonds operated as admissions of the sureties of their liability for the defalcation of their principal to the amounts respectively indorsed upon them, as well as a waiver of any known cause or ground of release or discharge from it existing at that time, and of the appropriation of the credits or payments which up to that time had been made by him, as they were then applied in the account as kept in the collector's office. And that would lead him to consider the doctrine of appropriation of payment on a running account, and wherefore it was that Day was so desirous of having the respective amounts ascertained and indorsed upon them with the consent of the sureties; and whether it was right and proper for him to require it under the circumstances.

All the taxes assessed under the act of 1862, went into
the hands of Clements prior to October 13th, 1864, the
date of the bond in the penal sum of $10,000, although
some of them were not collected until after the passage
of the act of June 30th 1864.   The rule as stated on the
other side with regard to the appropriation of payments
made upon an open and current account, was in general
correct, but it did not apply in a case where there were
different sureties with different liabilities, as in the pres-
ent instance.    *United States v. January*, 7 *Cranch* 572.   *U.
S. v. Eckford*, 1 *How.* 261. *Jones v. U.S.* 7 *How.* 688. *Stone v.
Seymour*, 8 *Wend.* 403. 15 *Wend.* 19. *Lyaght v. Walker*, 5 *Blight*
1. *Draffen v. Boonville*, 8 *Missouri* 396. *Buchanan County v.
Smith*, 26 *Missouri* 226. *Stamford Bank v. Benedict*, 15 *Conn.*
437.   But when the debtor fails to direct the application
or appropriation of the payments, the creditor may ap-
propriate them at his will and pleasure at any time before
action is brought.    *Mayor of Alexandria v. Patten*, 4 *Cranch*
320.   *U. S. v. Jones*, 7 *How.* 689. *Moss v. Adams*, 4 *Iredell* 42.
*Phillpot v. Jones*, 2 *Adol. v. Ellis*, 41. *Miles v. Fowker*, 5 *Bing-
ham (N. C.)* 455.   *Bosanquett v. Wray*, 6 *Taunt.* 597.   In
the absence of a special application by the creditor or
the debtor, and of any intervening and controlling equity
in the case, the law will apply the payments to the debt
for which the security was most precarious.    *Field v.
Holland*, 6 *Cranch* 27. *Moss v. Adms*, 4 *Iredell* 42. *Stamford
Bank v. Benedict*, 15 *Conn.* 437.   And under these principles
Day might well have said that he would not issue execu-
tion on either of the bonds, unless the sureties would con-
sent to ascertain the amount for which it should be issued
on each of them respectively.   (*Comegys*, the aggregate
amount due from Clements up to June 30th, 1864, was
$2,950.53.   The whole amount of taxes assessed which
went into his hands up to that time, was $11,916.13, so
stated the counsel on the other side.   Of this sum there
went into his hands during the months of July and Au-
gust 1864, but assessed under the act of 1862, taxes to
to the amount of $6,427.71, which, deducted from the

amount last stated, leaves the sum of $5,488.42). The sections 7 and 14 of the act of 1862, showed and exhibited the fact that the annual lists which went into his hands in July and August 1864, and must therefore have been, and were, assessed under the act of 1862, and were to be as of the date of the first Monday in the month of May 1864, and prior, of course, to the passage of the act of the 30th of June in that year; and whilst the act of 1862 was yet in full force and effect. On the 22nd of March 1865 he paid to Day $5000, and had in his hands lists assessed and issued under the act of 1864, up to January of that year, 1865, to full that amount, and it was out of the money collected on those lists that the sum of $5000 was paid by him at that time; and it was the money which he had previously collected on the lists issued to him under the act of 1862, that came to his hands during that year and the years 1863, and 1864, which he lost in his grain trade during the fall and winter of the latter year.

In regard to the cancellation of the indorsements on the bonds by the decree of the court on the ground of mistake or misapprehension on the part of the sureties, either as to any fact alleged in the case, or as to the legal effect and operation of them, or of both, the rule in equity was well settled, that where the uncertainty either as to the facts, or the law in the case is present to the minds of the parties, and they intend to compromise and settle the matter in question between them, whatever their rights or claims may be, and either knowing the facts, to compromise any doubt or question of law as applicable to them, or being doubtful as to the facts, to compromise both the facts and the law in regard to the matter, there can be no good reason for invalidating or setting aside the transaction upon the ground of misapprehension or mistake merely in either, or both of those respects. For if it was based on the existence of a doubt in either, or both of those respects, there could be no mistake in what was done by them in the matter, and the simple fact that one of the parties was in error as to the amount of benefit or advantage which he re-

linquished by it, could create no equity in his favor; and, therefore, the indorsements and the agreement between the sureties themselves, having been made with such knowledge of the facts of the case as the accounts in the office then disclosed, and Clements himself admitted, and with such a doubt as to their legal liability to account for the defalcation in the proportion agreed on, to Day at all events, though not as among themselves ultimately, unless so decided in the arbitration agreed upon between them, there could be no ground whatever far the cancellation of the indorsements, even, if they were mistaken as to the legal effect and operation of them at the time when they made them. *Adams' Eq.* 189. *Story's Eq. Juris. secs.* 111, 113, 116, 126 (*n*) 131 (*n*) 137 (*n*), 157. *Union Bank of Georgetown v. Geary*, 5 *Pet.* 99. *Shotwell v. Murray*, 1 *Johns. Ch. Rep.* 512. *Lyon v. Richmond*, 2 *Johns. Ch. Rep.* 51. *Storrs v. Barker*, 6 *Johns. Ch. Rep.* 169. *Taylor v. Patrick*, 1 *Bibb* 168. *Fisher v. May's Heirs*, 2 *Bibb* 448. *Exrs. of Wurtermuter v. Snyder*, 2 *Greenl. Ch.* 490.

Nor was it necessary for Day to enter into bond again, as collector of the district, after the passage of the act of June 30th 1864; for the general provisions of it, and particularly, of the ninth section of it, saved the necessity of it.   The portions of the act of 1862 repealed by it, *sec.* 173 *page* 96, together with the saving clauses of the same section, *page* 97, and the correct construction of *section* 9, also rendered it clearly unnecessary.   The provision of it, however, requiring any bond whatever from such an officer of internal revenue, was not absolutely obligatory, but only directory in its character; and it was, therefore, entirely subject to the discretion of the Secretary of the Treasury. And such a bond was designed only for the benefit of the Government, and constituted no part of the contract with the sureties in a bond taken by him from any of his deputies.   *Bank of the U.S. v. Dandridge*, 12 *Wheat.* 64. *U. S. v. Vanzandt*, 11 *Wheat.* 190. *U. S. v. Bradley*, 10 *Pet.* 345.   *Bowman v. Barnard*, 24 *Verm.* 355 *Boreland v. Washington County*, 8 *Harris* 150.   But

even, independent of that fact, and of the principle of law he had stated and the authorities which he had just cited to sustain it, the appellant was estopped by the bond which he had executed as one of his sureties, and by the endorsement under his hand and seal upon it, to deny that Clements was deputy collector during the period in question. *Billingsly v. The State*, 14 *Maryland* 369. *Ford v. Clough*, 8 *Maine* 334. *U. S. v. Bradley*, 10 *Pet.* 365. Nor was Day bound to dismiss him from the office as soon as he had discovered his defaults in it, or the defalcation in question; because the fidelity of Clements in the office and the due discharge of the duties and obligations of it by him, was exactly what the appellant became his surety for in the bond. *U. S. v. Kirkpatrick*, 9 *Wheat.* 720. *U. S. v. Vanzandt*, 11 *Wheat.* 697. *Postmaster of Erie v. Reeder*, 4 *Wash. C. C. Rep.* 679. But in point of fact, he was dismissed very soon after the defalcation was discovered, and the appellant was aware both of his defalcation and dismissal from office when he signed the indorsement on the bond. Besides, he sustained no injury by the delay which intervened, but was benefited by it, as the defalcation was considerably diminished by payments made by Clements in the mean while.

The allegation of the appellant as to the false statement made to him by Day in July 1865, in reply to his inquiry concerning the payments of Clements to him, and whether he was behind with them, was distinctly denied in the answer, and there was no evidence whatever to sustain the assertion so made by the appellant; whilst the charge made in the bill upon the authority and information of Clements, given after the discovery and exposure of his defalcation, that he had ever in any manner consented to or acquiesced in his use or employment of the public funds in his hands in the purchase and consignment of grain to his factors in Philadelphia and New York, or that he had any knowledge of it until after the discovery of his defalcation, was also directly denied with equal distinctness in the answer, and which allegation

of Clements was likewise unsupported by any evidence, except the equivocal and dubious declarations made by him when examined as a witness on that point. Because the acceptance by Day of the several drafts on the houses referred to in payment of sums due from him as deputy collector, did not prove that he knew at the time he accepted them and when they were paid, that they were for the proceeds of grain which had been purchased by the firm of John F. Clements & Co. with the public money, or that he consented to such use of it; for it appeared from the books of the collector's office, as well as from the deposition of Clements himself, that he had accepted such drafts from him prior to the time when the latter alleges he gave his consent to such use of the money; and also that it was his practice to accept drafts on good and responsible parties from his other deputies in preference to receiving payments in money, for the reasons stated in his answer. Besides, the court would observe, what was equally pregnant, important and conclusive in its bearing on that question of fact in the case, that it was expressly contradicted and denied and wholly refuted by the admissions and acknowledgments to the contrary, of Clements himself to Day, after the defalcation had occurred, in the presence of the witness, Bateman, as stated in his deposition.

*Comegys*, for the appellant. Would limit and confine his remarks to a single question in the case, and that was what is the effect of the repeal of a statute? It was to obliterate and annul it as completely as if it had never been or existed as a law, except as to acts done, absolute rights acquired and vested, contracts executed, and actions commenced and concluded under it whilst it was yet in force and operation, except so far as they may be preserved and saved by express provision of the repealing act. *Sedw. on Const. & Stat. Law*, secs. 129, 130, 131. And such being the principle of law on the subject, the question was whether there was any thing in the repeal-

ing statute in question, the act of Congress of June 30th 1864, to preserve, or save and continue the exercise of the official powers, functions and duties of a collector of internal revenue under the act of Congress of 1862? The effect of the repealing act of 1864, was to suspend the exercise of the powers and duties of such a collector under the act of 1862, until he had given bond for the due performance of his duties under the act of 1864; because the latter act increased enormously the duties devolved upon him by the act of 1862. For whilst the taxes imposed by the act of 1862, were but comparatively few and limited, those imposed by the act of 1864, were universal and applied to every thing that could possibly be reached by way of taxation. The latter, it was true, had saved the office of collector created by the former, and continued the incumbent holding it at the time of the passage of the latter act in such office, but it did not continue the liability of his sureties, or of the sureties of his deputies. It was, however, contended on the other side that the provisions of the ninth section of the latter act, which required that before any collector should enter upon the duties of his office, he should execute a bond for such amount, as was further provided for and prescribed in it, was designed to apply only to such collectors as should be thereafter appointed to such office. But the language of the act did not say that; and if such was the intention of it, why did it not say so, in so many words? He was, therefore, warranted in contending that such was not its meaning, and that it was not prospective merely in its design and operation, but included and applied alike to all such collectors as were already in office, as well as to those who should be thereafter appointed; for the office after the passage of the latter act, became in fact and in effect another and substantially a new office, created by another and a new law, with new and greatly increased powers, duties and responsibilities conferred and imposed by it. But if it did not thereby become another and a new office, but continued to be the same

65

office afterward that it was before the passage of the latter act, then the effect and operation of that act upon it, was equivalent to another and a new term in it with greatly enlarged powers, duties, risks and liabilities on the part of the holder of it ; and, therefore, he could not have lawfully entered upon the performance of it without executing a new bond under the provisions of it, conditioned for the due performance of the new and increased duties imposed by it.   4 *Maryl.* 189.  11 *Gill &* *Johns.* 382.

It was true that all the provisions of the former act which provided for the office of collector, and for the qualification of such officer, were saved by the exceptions and reservations in the repeal of it contained in the latter act, but there was not a word to be found in any one of those exceptions, which said or intimated that any bond already executed under the former act by such an officer, should suffice, or be continued under the latter act ; and if Congress so intended, why such total absence of any words whatever to express that intention? As soon, therefore, as the act of 1864 was passed, and the act of 1862 was repealed without any such exception expressly continuing the bonds of such collectors and deputies then in office, as well as the general provisions of the previous act in reference to their appointment and qualifications, the bonds of Clements and his sureties fell and expired with it, and were thenceforth utterly and absolutely *functus officio*. 38 *Maine* 586. 46 *Maine* 541. 19 *How.* 73.   25 *Penna.* 23.   And such being the case, the sureties of Clements were released and discharged from any liability for or on account of the annual lists which went into Day's hands and his, in the months of July and August 1864, which amounted to over $6000, notwithstanding the assessment might have had relation back to the first Monday in May of that year, because the liability of his sureties for the due collection of the taxes on such lists, could only accrue or begin from the time they came to his hands for collec-

tion in July and August of that year, which, of course, was after the 30th of June preceding, when their bonds were so released and discharged as before stated, and they could not be carried or extended back by legal relation or presumption to the first Monday of May in that year, so as to make them in any manner liable for that amount; for they could never have been liable for any taxes assessed, until the lists of them had come into his hands for collection.

There was only one other matter to which he would refer in closing the protracted argument in the case, and that was the purpose for which the indorsements were made on the bonds; and in relation to which it clearly appeared that in the long interview and conference between Day and the sureties which preceded it, the sole object and desire of the latter was to prevail upon him to enter the bonds and sue out execution upon them forthwith against Clements alone, so as to obtain the first lien on his personal property for their relief and benefit as far as it would go, and that Day repeatedly and peremptorily refused to do it on the ground, as all the while alleged by him, that he could not do it until the two sets of sureties had agreed to the apportionment of the defalcation between them, and the respective amounts for which the execution should be issued upon them ; and it would be remembered that it was not until after it had been so alleged by him several times, that the surety, Green, who it seems could not see it in the same light, but gravely doubted the soundness of such a conclusion, proposed to go for Mr. Smithers, and that they should take his opinion and advice in regard to it, when Day at once suggested that he would go himself for him and bring him, and after a short absence returned with him to the office, when further conversation ensued between them in relation to that and other matters which brought them together on that occasion ; and although it appeared that the counsel informed them that an assignment of any part of the partnership property by Clements, or an execution upon it might

interfere with the superior claims of partnership creditors against such property, it certainly did not appear that he expressed any opinion whatever upon the only question which seemed to have taken him there; or that he ever informed any of the parties present that it was in the power of Day to enter either or both of the bonds against Clements severally and sue out execution thereon against him alone, without apportioning the whole indebtedness or defalcation between them, or indorsing any amount whatever on the back of them. On the contrary, he would seem from his silence, at least, on that particular and important point, to have sustained Day in the object which he evidently had in view when he assigned such a reason for not doing so, and which was not merely to induce, but to coerce and constrain the sureties to assent to such an admission and acknowledgment of their absolute liability for the whole amount of the defalcation before they left his office, or could learn any thing more about it. He did not mean to impute to the counsel any improper motive or unprofessional reticence on such an occasion, for he was doubtlessly entirely unconscious of what had been done or said by any one in the office before he was invited to it, or how he came to be called upon to attend at such a meeting, but went there at the special request of Day, and as his already retained counsel in the case, and his first duty as such, of course, was to do the best he could for him under the circumstances. But after much had again been said in relation to the same proposition, and Day still insisting on the same indispensable condition and actual necessity, and still being unable to learn any thing to the contrary from the learned counsel, it seemed at length to have occurred to two of the sureties that the time had come for retaining him as their counsel in the matter, when to their great disappointment and surprise, they for the first time discovered that he was not their mutual adviser in the business then before them, but the retained counsel of Day ; for the counsel himself immediately and frankly so informed them, and politely advised them to employ other

counsel, at once, to attend to their own special interests in the matter, and which they accordingly did by speedily addressing themselves to his colleague as their counsel. But by that time so much doubt, difficulty and delay had perplexed and prolonged the settlement of the question, and Day being still as resolutely bent on accomplishing his purpose, they were finally constrained to comply with his terms and conditions. In the meanwhile the question of their future liability to each other had arisen, and the agreement entered into between them at the same time to refer it to arbitration was very conveniently and adroitly suggested, and the whole thing was so arranged and concluded that he obtained from them, under the pretext, that it was absolutely necessary in order to enter judgment on the bonds against Clements alone, such unqualified acknowledgments under their hands and seals, of their absolute liability for the whole of the defalcation as he then presented to them, as upon their face, could not possibly have been made any stronger, or more conclusive. The last, however, was even better and stronger, if possible, than the first for such a purpose ; for on that point there was one discrepancy between the agreement to refer the questions alluded to between themselves to arbitration, and the written indorsements upon the bond, which he wished particularly to notice. In the preamble or recital contained in the agreement, the following strong and emphatic terms were added, " and whereas it has been agreed by the undersigned that for the purposes of collection and payment to the said Charles H. B. Day the sums due on said bonds respectively, are as follows, &c." but there were no such words as those in the indorsements themselves, as strong and conclusive as the latter were. But it was not necessary for him to say here in the presence of the court, that there was not the slightest shadow of a foundation for that pretext so often repeated and asserted by him, and which alone induced them to make those acknowledgments, that he could not enter judgments severally on the bonds against

Clements and sue out execution thereon against him alone, so as to do what they so much desired of him, unless they would agree to ascertain the separate sums in which the whole amount of the defalcation should be divided and apportioned and indorsed upon them respectively. And if so, was not that such a false and fraudulent misrepresentation of a thing which he could readily and easily have done at any moment without it, (and in less time without it, than with it), as would justly entitle them in a court of equity, to relief against such a gross imposition so practiced upon them? He was amply secure, as he said, without any such entry and execution, and could enter judgments against them all, and then rest in entire safety, but if they wanted it done for their own benefit and advantage, it could only be done on the imperative condition imposed by him. And was it not a most inequitable and unscrupulous advantage taken of the sureties by means of a false and fraudulent pretence under such circumstances? No court of equity, he thought, could possibly contemplate or consider it in any other aspect. A proper regard for the sureties of his debtor under such circumstances, would have instantly prompted him to comply with such a reasonable desire on their part without a moment's hesitation, had he not been from the first, solely and resolutely bent upon a preconceived purpose to force them into this measure; and bound, as he was in honor, conscience, justice and equity to have complied with such a request without hesitation, or any other consideration than the relation in which he stood to them, and the knowledge he possessed and the satisfaction which he felt that they were not only bound, but would be able to pay every dollar of the defalcation which was justly due to him from them, it was no less inequitable and fraudulent in him now to take advantage of the mere terms of the indorsements and agreement to submit to arbitration the questions which had arisen between themselves, and to pervert them from their true and only object and design, which was as well known to him as to them, and to contend, as his counsel had so ably done for

him, that they now constituted, even in a court of equity, a complete defence in the case.

*Gilpin, C. J.*, announced the opinion of the Court. The second section of the act of Congress of July 1st 1862, entitled "An act to provide internal revenue to support the government and to pay the interest on the public debt," authorized the President of the United States to appoint collectors of internal revenue, for the several collection districts into which the States, territories and the District of Columbia should be divided. The fourth section of the act declares that before any such collector shall enter upon the duties of his office, he shall execute a bond, for such amount as shall be prescribed by the commissioner of Internal Revenue under the direction of the Secretary of the Treasury, with not less than five sureties, to be approved as sufficient, by the solicitor of the Treasury—Containing the condition &c. &c. By the fifth section of the act, each collector is authorized to appoint by an instrument of writing under his hand, as many deputies as he may think proper: and may require bonds or other securities, and accept the same from such deputy; and each of such deputies is invested with the like authority in every respect, to collect the duties and taxes levied or assessed within the portion of the district assigned to him, which is by the act vested in the collector himself. And here it may not be amiss to remark that while this section expressly provides that the collector shall in every respect be responsible, both to the United States, and to individuals, as the case may be, for all money collected and for every act done as deputy collector by any of his deputies whilst acting as such, and for every omission, it does not in any event whatever make the deputy responsible, either to the government, or to individuals, for his own faithfulness, or for the manner in which he shall perform his duties. The collector is the recognized agent of the Government, and is made responsible to the Government; the deputy is the agent of the collector, and is made re-

sponsible to him, and not to the government, and he may take security, or not, as he pleases. We do not deem it material to consider at much length, the question raised by the bill in regard to the money collected from divisions No. 9 and 10, and which it is contended should be credited in reduction of the amount indorsed on the bonds, as being due from Clements to Day on the 10th of August 1865; because we think it is satisfactorily shown by the answer, and by the testimony of Clements himself, the witness of the complainant, that all the money collected by Clements from these divisions during the time he was deputy collector of No. 9, and paid over to the defendant, have been properly applied by the latter, and that the same constitutes no part of the sum of $11,520 57, which is divided between, and indorsed on the bonds, as the amount of the defalcation. Nor do we consider it necessary to advert to the checks of April 29, 1864 and February 7th 1865, which are claimed as additional credits in reduction of the said sum of ·$11,520.57, further than to say that it satisfactorily appears from the answer, and from the testimony of Bateman, Prouse, and M. Day that the first was given in satisfaction of a note due William L. Hansel & Co., then in the defendant's hands for collection, and that the second was given in reimbursement of money loaned by the defendant to Clements on his private account. The testimony of Clements on this point, is very weak and uncertain; at most, it amounts but to an impression or belief on his part. The answer on the contrary, is direct and positive, and is supported by the evidence of defendant's witnesses. After a careful examination of the acts of Congress upon the subject of internal revenue, we are of opinion that molasses manufactured from sorghum, was a subject of taxation under section 75 of the act of July 1st, 1862, and under section 94 of the act of June 30th, 1864; under the former, of *three* per cent. *ad valorem*, and under the latter, of *five* per cent. *ad valorem*. We think it comes within the meaning of the terms " or of other materials," to be found in the paragraphs commencing with the words " on all manufac-

tures of cotton, wool, silk, worsted, flax, &c." The language of both paragraphs is the same. It is quite unnecessary to state the process of reasoning by which we have arrived at this conclusion.

Having thus briefly disposed of these several matters, we will now consider the more important questions presented by the case, and which the counsel on both sides, have discussed with so much ability. The defendant, Charles H. B. Day, was appointed and commissioned collector of Internal Revenue for the collection District of the State of Delaware, on the 4th of March 1863, to hold the office during the pleasure of the President. He gave bond of that date to the United States, according to the requirements of the fourth section of the act of July 1st 1862. On the first of October 1863, he re-districted the State, reducing the number from twelve, to six divisions, two for each county, and on the same day he appointed John F. Clements deputy collector for division No. 4, comprising the hundreds of Murderkill, Milford, and Mispillion in Kent county. Some days afterward, but prior to the 20th of October 1863, Clements, as deputy collector of division No. 4, with James R. Clements, William Smith, James Green and Thomas Pickering, as his sureties, executed and delivered to Day, as collector of Internal Revenue, a bond in the penal sum of ten thousand dollars, conditioned in substance, for the faithful and diligent collection of all rates and taxes which should be committed to him for collection, and to pay over the same at such times, and in such manner and form, as the said Day should prescribe and direct. On the 13th of October 1864, Clements as deputy collector of division No. 4, with James R. Clements and Daniel McBride as his sureties, executed and delivered to the defendant as collector of Internal Revenue, another bond in the penal sum of five thousand dollars, with like condition as that annexed, or underwritten to the said bond for ten thousand dollars. The object or purpose of both bonds was the same, the protection and indemnification of the defendant against all loss and dam-

66

age to which he might become liable, by reason of the default or misconduct of Clements as deputy collector of division No. 4, the sureties taking upon themselves the responsibility of guaranteeing the faithfulness of Clements in collecting and paying over all the public money which should come to his hands as such deputy.   Shortly after the execution of the bond of October 1863, Clements entered upon the duties of his office as deputy collector of division No. 4, and continued therein until the 15th of July 1865, when he was removed; it appearing according to the accounts, that he was a defaulter on the first of July 1865, to the amount of $11,520.57.   It is stated in the answer that this sum was somewhat increased by the subsequent discovery of additional items of indebtedness. This sum, however, was assumed on the 10th of August 1865, by all the parties interested, to be the actual amount of Clements' indebtedness, and he and his sureties in both bonds on that day entered into an agreement with the defendant to apportion and divide that sum between the two bonds, according to the same proportion which the penal sums mentioned in the bonds respectively bore to each other; by which agreement written on the said bonds, and executed under the hands and seals of Clements and his sureties, the sum of $7,680.38 is ascertained and declared to be the true amount due on the bond of October 1863, with interest from June 30th 1865, and the sum of $3,840.19 is ascertained and declared to be the true amount due on the bond of October 13th 1864, with interest from June 30th 1865.   At the same time the sureties between themselves, executed another agreement, to which, as constituting a part of one general arrangement in regard to their respective liabilities, we may here after have occasion to refer.

The question which we now propose to consider is, whether the defendant, Day, consented to Clements' using the public money in his private business of buying and speculating in grain.   The bill, on information derived from Clements, charges that he did consent to such use of it.   If this be true, it was a fraud on the sureties, and dis-

charges them from their liability. But the answer, on the contrary, denies the charge directly and positively where-ever made, insinuated, or suggested in the bill. The language of the defendant is that he " utterly denies that he ever did directly or indirectly assent, consent, or agree to the use of any such money by the said John F. Clements, or John F. Clements and William S. Prouse, trading as John F. Clements & Co. or by any other person whatsoever," and he avers that he had no information or suspicion that the money was so used or employed until about the first day of February 1865, when upon balancing his accounts as of the first of January then next preceeding, it was discovered that he was a defaulter. As the answer of a defendant is a formal and deliberate statement, it is evidence against him, and when made under oath, as is usually the case, it is evidence of the most conclusive character. But whilst this is so, it is nevertheless equally true that his sworn answer is also evidence in his favor, equal in weight to the testimony of a single witness, and is not to be discredited nor any presumption raised against it, by reason of its being the answer of an interested party. And the answer is sufficient in itself, if direct and positive and responsive to to the bill, to establish the denials and the affirmations of facts which it contains, if not outweighed by opposing proof. *Allen v. Mower*, 17 *Vermt*. 61. *Powell v. Powell*, 7 *Ala*. 582. *Schwarz v. Wendell*, *Walk. Ch*. 241. *Woodcock v. Bennet*, 1 *Cowen* 711. 3 *Greenl. Ev. sec*. 285. And this is so, because, the complainant having seen fit to make the defendant answer under oath, has substantially made him his witness, and it would be unreasonable and unjust, after compelling him to testify, to treat his testimony as entitled to no credit. His oath is therefore deemed to be equal to the oath of a credible witness, and the complainant is bound by his answers, unless they are satisfactorily disproved. 10. *Johns*. 542. The well established rule in courts of equity in regard to the denials of a defendant, as stated in 3 *Greenl. Ev. sec*. 289, and which may be said, with some slight qualification, to embody the result of the decisions

on this point, is "that an answer which is responsive to the allegations and charges of the bill, and contains clear and positive denials thereof, must prevail, unless it is overcome by the testimony of two witnesses to the substantial facts, or, at least, by one witness, and other attendant circumstances which supply the want of another witness, and thus destroy the statements of the answer, or demonstrate its incredibility or insufficiency as evidence." The true meaning of the rule, however, is not that the testimony of a witness with additional and corroborative circumstances, is indispensable in all cases; because circumstances alone may sometimes be found in the answer itself, or in documentory evidence referred to in the answer sufficient to more than countervail the denials of the answer. The rule properly applies to the case of an answer opposed only by the testimony of a single witness.

Now, if this case stood alone on the bill and answer, or on the bill, answer, and the testimony of a single witness, it would be perfectly obvious that the complainant had not made out a case upon which he could stand in a court of equity. For it is certainly well settled, as we have seen, that where the allegations and charges in the bill as grounds for obtaining a decree are clearly and positively denied by the answer, and proved by only a single witness, the court will not decree against the defendant. But on the other hand, it is equally well settled that where the witness on the part of the complainant sustains the allegations and charges of the bill, and his testimony is supported by corroborative circumstances, the denials of the answer will be overborne, and the complainant will consequently be entitled to a decree. But in order to have this effect, what must be the character of the witness, and his testimony? And what the nature of the corroborative circumstances? We answer that the witness must not only be competent, but his testimony must be credible, and the circumstances relied on as corroborative, must be such as to materially support the witness, and strengthen his testimony, so that when both are considered together, they

may be sufficient to satisfy the conscience of the court that the allegations and charges of the bill, in respect to the point in controversy, are true. And it has been held that if the answer be positive, denying the charges in the bill, it ought not to be overthrown by evidence less positive, though it proceed from the mouth of two witnesses. *Auditor v. Johnson* 1. *Hen. & Munf.* 536. Nor should such answer be considered outweighed by mere proof of facts or circumstances which may be reconciled with the truth of statements contained in the answer. *Branch Bank v. Marshall,* 4 *Ala.* 60.

Now, the first general observation which we have to make in regard to the witness Clements and his testimony, is that he appears to be a person of uncertain and imperfect recollection. He does not recollect many things which would have impressed themselves upon most men's minds, and which, from their nature and importance, he ought to have remembered. One would suppose that a person situated as he was, would have a vivid recollection of all that was said, and of all that occured in relation to this subject; and yet, he does not remember the respective amounts for which his bonds were given. He says two of them were for $10,000 each, and one for $5,000, and he thinks the $5,000 one was given for stamps, and that Green and Pickering were on all the bonds. Now, we know that these things are not so. He is also strangely oblivious of almost every thing that was said or done on the 10th of August 1865, at the interview and arrangement which took place at the collector's office, although he was present during the whole time. He says he remembers that whilst deputy collector of No. 9, he told Day that unless he allowed him to use the public money, he would resign; and yet, he does not know, nor remember Day's reply, but says he did not object. He next says his impression is he gave his consent, and subsequently he becomes very sure he gave his consent; and lastly, he avers that he did consent on the occasion of Mrs. Wilson's funeral; but he does not recollect the month when this took place, or whether it occurred in 1863 or in 1864. His answers to the inter-

rogatories propounded to him in this regard, are hesitating, limping answers. And as a whole, his testimony is defective, obscure, uncertain, doubtful and unsatisfactory. Moreover, he is discredited by John H. Bateman and Matthias Day. Then, as to the corroborative circumstances. It is alleged and proved, and admitted by the answer, that the defendant was frequently paid by drafts of the firm, drawn by Clements on their factors in Philadelphia and New York; and it is insisted that this shows that Day consented to the use of the public money by Clements in his grain business. It appears by the bill of the complainant that at the time of the appointment of Clements as deputy collector, he was already extensively engaged in association with Wm. S. Prouse, in the business of buying and selling grain, and speculating in the purchase and sale thereof. And it appears from other sources, that his house was in good standing and fair credit, and that their drafts were always honored and paid at maturity. There is no suggestion in the bill that either Clements, or his house, had been at any time prior to the discovery of his defalcation in 1865, in embarrassed circumstances. According to the allegations of the bill, he was conducting an extensive business, and it seems that his credit was good. It does not appear from any evidence in the cause, that he extended his business after his appointment. It would seem, therefore, whatever may have been the real fact, that there was no necessity for his using the public money in his business. If he could carry on an extensive business on the means and credit of his firm before his appointment, why could he not do so after his appointment? There is no evidence tending to show that the defendant knew or suspected that he had made any losses. Why then, should he suspect that Clements was abusing his trust? How then, can we say under such circumstances, that the receiving of these drafts in payment of taxes collected by his deputy, shows that the defendant consented to the use of the public money in Clement's grain business? The defendant admits in his answer

that he received the drafts in payment of taxes collected, but he states at the same time in response to the allegations of the bill, the circumstances under which, and the reasons why, he received them. And we think that the fact that he did so receive them, is reconcilable with the denials and averments of the answer. We, therefore, fully agree with the Chancellor on this point, that the answer must prevail.

The next question which we propose to consider is, whether the complainant and his co-sureties were discharged from their liability under the bond for $10,000, executed and delivered in the month of October 1863, by reason of the act of Congress of June 30th. 1864, entitled "An act to provide internal revenue to support the government, pay interest on the public debt, and for other purposes." By the 173rd. section of the last mentioned act, the internal revenue act of July 1st. 1862, is declared to be repealed, "except the one hundred and fifteenth and one hundred and nineteenth sections thereof, and excepting further, all provisions of said act which create the offices of Commissioner of Internal Revenue, assessor, assistant assessor, collector, deputy collector, and inspector, and provide for the appointment and qualification of said officers." And after repealing other acts and parts of acts, there is the further exception in the form of a *proviso*, that the provisions of said acts shall be in force for levying and collecting all taxes, duties and licenses properly assessed, or liable to be assessed, or accruing under former acts, or drawbacks, the right to which had already accrued, or might thereafter accrue under said acts; and for maintaining and continuing liens, fines, penalties and forfeitures incurred under and by virtue thereof, and for carrying out and completing all proceedings which had been already commenced, or that might be commenced to enforce such fines, penalties, and forfeitures, or criminal proceedings under said acts, and for the punishment of crimes of which any party should be, or had been, found guilty. And, as if to shut out all question or doubt as to who

should exercise the powers, and perform the duties referred to in the savings of the act, it is further provided, "that no office created by the said acts and continued by this act, shall be vacated by reason of any provisions herein contained, but the officers heretofore appointed shall continue to hold the said offices without re-appointment." Now, our duty is to ascertain, if possible, what Congress meant by these saving clauses? They are perhaps deficient in precision and clearness, but, however faulty or imperfect in phraseology or structure, we are bound to give to them such an interpretation as may appear best adapted to effectuate the object contemplated by Congress. When the design of the Legislature is not clearly apparent, it is always to be presumed they intended that the most reasonable and beneficial interpretation should be given to the language which they have used. If the language is clear, and the intent manifest, there is, of course, no room for presumptions. But if, on the other hand, the language is not clear, and it is obvious that by a particular construction in a doubtful case, great public interests would be endangered or sacrificed, the court ought not to presume that such construction was intended by the makers of the law. Now, remembering that the intention of Congress, if it can be ascertained, is to govern, and that a thing which is within the meaning of the makers of the law, is as much within the law, as if it were within the letter; and applying the rules of construction, which we have suggested, to the savings of the 173rd. section, and to the declaratory clause contained in the second proviso thereof, we think it is not difficult to give a reasonable and safe, as well as beneficial construction to the clauses under consideration.

The learned counsel for the complainant insist that immediately upon the passing of the act of June 30th. 1864, the office of collector created by the act of July 1st. 1862, ceased to exist; and that the defendant and his bond, being thus rendered *functus officio*, the sureties of his deputy, Clements, who gave bond under the act of July 1st.

1862, were discharged from liability. And, assuming as they do, that the defendant no longer held the office which he had prior to June 30th. 1864, or that if he was in office, it was a new office, with new duties and responsibilities by force of the act of June 30th. 1864, the 9th section of which required him to give a new bond before entering upon the duties of his office, they insist that, as he had not given such new bond, he was not legally competent to appoint a deputy, or to take a bond from him, and that, therefore, the bond of the thirteenth of October 1864 for $5000 is a mere nullity. Are these positions of the counsel tenable? We think they are not. It seems to us that the manifest design of Congress was to prevent any break, suspension, or interruption in the collection of internal revenue, by preserving and continuing in active operation, all the old instrumentalities which had been provided for that purpose. We consider that the provisions of the act of July 1st. 1862, which create the offices of collector and deputy collector, and provide for their appointment and qualification, namely, the second, fourth, and fifth sections, are by the exception or saving taken out of, and excluded from, the operation of the repealing clause; and that these sections remain unrepealed and in full force; and that the defendant and his deputy, Clements, continued to hold their respective offices by force of their appointment under these unrepealed sections. And we consider that the defendant's bond, and also Clements' bond of October 1863, remain in full force, in so far, at least, as respects the taxes and duties assessed and levied under and according to the rates prescribed by the act of July 1st. 1862. We do not mean, however, to be understood as saying that the obligation of either bond is necessarily limited to the taxes and duties collected under that act. For, as the appointments were indefinite and without limitation as to time, and as the bonds are for the faithful performance of the duties of their offices according to the conditions thereof; and as it would seem that the responsibility of the sureties is co-extensive with that of the principal, it might perhaps, be

67

justly holden that the responsibility of both principal and sureties under their bond would continue so long as the principal's employments under their appointments continued. But it is not necessary to decide this question, and we, therefore, express no opinion on it. As regards the collector and his deputy continuing to hold their offices, we think the result would have been the same without the provision contained in the second proviso of the 173rd. section, which provision seems to us to partake more of the character of a declaratory law than any thing else. It does not create any office, nor appoint any officer. It speaks of offices already "created" by other acts of congress "and continued by this act." But how continued by this act? Continued, we answer, by being excepted, and thus taken out of, and excluded from, the operation of the repealing clause. It declares that these offices shall not be vacated by reason of any provision contained in the act. It speaks of officers "heretofore appointed," and declares they shall continue to hold "the said offices," meaning the offices which were created by prior acts, and which they already held prior to the act of June 30th. 1864.

Another question which we have been called on to consider is, whether the defendant who had given bond under the act of July 1st. 1862, was under any legal necessity of giving a new bond after the passing of the act of June 1864 ? If, according to our theory, he was already in office under the former act, had already given bond and entered upon the duties of his office, and had been continued in said office by reason of the savings just referred to, then it would seem to follow that it could not have been the intention of Congress that the ninth section of the act of June 30th. 1864, should apply to his case, or to any such case; but rather, that it was intended to apply only to future appointments. It is true, the Secretary could have required him to give a new bond; for under both acts, collectors are required to renew, strengthen and increase their bonds, whenever directed by the Secretary of the Treasury to do so. But let us extend the inquiry. Is the

giving of a bond by the appointee, made by either act, a condition precedent to his authority to exercise the powers and perform the duties of a collector of internal revenue? Let us see. It is true, he is to execute a bond for such amount as shall be prescribed by the Commissioner of Internal Revenue under the direction of the Secretary of the Treasury. But here, something is to be done by the Commissioner, before the bond can be executed. The Commissioner is first to prescribe the amount, and if this be done, then the collector can give the bond. Can he give it before the amount is prescribed? But suppose the Commissioner from any cause should fail to prescribe the amount, should the collector be considered in default, and thus rendered incapable of exercising his proper official functions, because he has not done that which he could not do until the amount of the bond had been prescribed by that officer? We have not urged the argument of inconvenience, because it is only where there are serious doubts as to the proper construction of the statute, that such arguments are entitled to much weight. But after giving full consideration to the argument which has been urged with so much earnestness on behalf of the complainant, we are constrained to differ from his counsel, and to say that we do not consider the giving of a bond a condition precedent to the collectors entering upon the discharge of the duties of his office. On the contrary, we think the fair and reasonable interpretation of the provision in question is, that it is merely directory to the proper officer of the Treasury department, and that the execution of the bond may be, either required or waived, according to his discretion. The bond, we know, is intended solely for the security and benefit of the government, and we are unable to see how it can constitute any part of the contract of Clements or his sureties, or how the giving, or not giving of it, can in any way affect their responsibility. The bond of the defendant to the government, and the bond of Clements to Day, constitute distinct and independent contracts, and impose on the parties respectively distinct and

independent obligations.   In conclusion on this point, we think this doctrine is fully sustained by the cases of *United States v. Vanzant*, 11 *Wheaton* 190.   *Bank of United States v. Danbridge*, 12. *Wheaton* 64.   *United States v. Bradley*, 10 *Peters* 364.   *Bowman v. Barnard*, 24 *Vermont* 355.   *Boreland v. Washington County*, 8 *Harris* 151.   And, if this be so, then, we are justified upon principle as well as authority, in saying that the· defendant's authority as collector did not depend upon his giving bond, on the contrary, that he derived his official authority from his appointment, and the acts of Congress defining his powers and duties, and that his appointment as collector, was complete and valid for all purposes when confirmed by the Senate.

Again, the complainant claims to be discharged on the ground of misrepresentation and concealment on the part of the defendant, of material facts, and of the true state of affairs between him and Clements which he was bound in good faith to disclose truly to him and his co-sureties ; and he also contends that if not absolutely discharged from liability, still that the concealment of material facts by the defendant, at and before the time of the arrangement of August 10th 1865, and which if made known to the sureties would have prevented that arrangement, affords at least sufficient grounds to justify the Court in canceling the indorsements on the bonds, and thus to open the question of appropriation of payments, so that that question may be finally settled by this court, according to the rules of law.   Concealment, in the sense in which this term is understood in courts of Equity, means the concealment of those material facts and circumstances which one party to the contract, is under a legal or equitable obligation to make known to the other, and which the latter, of right and by law, is entitled to have communicated to him.  · 1. *Story Eq. Jur. sec.* 207.   And that as touching the liability of a surety, where there has been a defalcation on the part of the principal, the concealment of the fact must be active or industrious, and, therefore, fraudulent in its character. *Shepherd v. Beecher*, 2 *P. Wms.* 288. *Peel v. Tatlock*,

1 *B. & P.* 419. *Kent Nav. Co. v. Harley,* 10 *East* 34. *Goring v.
Edmonds,* 6. *Bing.* 94, 98. *Eyre v. Everett,* 2. *Russ.* 381.
*Wright v. Simpson,* 6 *Ves.* 734. *Orme v. Young,* 1 *Holt* 84.
*Leading Cases in Eq. Vol.* 2 *part* 2. *Am. notes,* 362. To be
available as matter of defence there must be an *undue* con-
cealment, or *Supressio Veri,* to the injury or prejudice of
the surety; for it is not every concealment, even of mate-
rial facts, that will discharge him. To have this effect,
the concealment must be injurious, and must fall within
some definition of fraud. Mere passiveness on the part
of the creditor in not enforcing his remedy, will not of it-
self discharge the surety; nor will failure or neglect to
give notice to the surety, of the principal's defalcation,
have that effect. The creditor under such circumstances,
is not bound to anticipate inquiry by disclosure. *Hamil-
ton v. Watson,* 12 *Clark & Fin.* 109. The *North Brit. Insur-
ance Co. v. Lloyd,* 10 *Exch.* 523. *Stewart v. McKean* 10
*Exch.* 675. In the case of *Wright v. Simpson,* Lord Eldon
says, as to the case of principal and surety, "I never un-
derstood that as between the obligee and the surety, there
was any obligation of active diligence against the princi-
pal. If the obligee begins to sue the principal and after-
ward gives time, the surety has the benefit of it. But the
surety is a guarantor, and it is his business to see whether
the principal pays, and not that of the creditor." Now,
what material facts has the defendant concealed to the in-
jury of the complainant and his co-sureties? We have
already decided that the charge of consenting to the use
of the money in the grain business, not having been made
out to our satisfaction, the denials of the answer in regard
to it must prevail. We have also decided that the giving
of a new bond was not a condition precedent to the collec-
tor's entering on the duties of his office. These matters,
therefore, are out of the way. But it is charged that the
defendant misrepresented to the complainant the state of
affairs between himself and Clements. The charge is not
sustained by proof, and it is denied by the answer.

Again, it is contended that in consequence of a want of knowledge of facts which it was the duty of the defendant to have communicated to them, the complainant and his co-sureties were surprised into the execution of the indorsements on the bonds, and that the same were made under a misapprehension of their rights, and without due deliberation; and, therefore, the indorsements should be canceled. We do not so understand the case. It is a well known maxim that ignorance of the law excuses no one; it cannot, therefore, constitute a ground for setting aside, or reforming a written agreement. Ignorance of fact may. *Ignorantia facti excusat.* But a court of equity will not grant relief in cases of written instruments, unless there is a plain mistake clearly made out by satisfactory proofs. 1 *Story Eq. Jur.* sec. 157. It seems to us, that all the parties that met at the defendant's office on the 10th of August 1865, understood perfectly well what they were about. They knew Clements was a defaulter; they knew the amount; the books and accounts were there open to their inspection. They went there by appointment for the express purpose of arranging this very matter in some way or other. The bonds were there and they discussed the question of whether the second bond was in addition to, or superceded, the first bond; they discussed their respective liabilities under these several bonds, and they entered into an agreement among themselves to refer the question of their respective liabilities, as between themselves, to arbitrators. They considered the expediency of protecting themselves by taking an assignment from Clements; and they urged the the defendant to issue execution against Clements, which he refused to do, unless they first made the indorsements on the bonds, ascertaining the respective amounts due thereon. They remained there, discussing and deliberating on these matters for a period of six hours and upward. But they say they wished execution issued against Clements which the defendant refused to issue unless they, the sureties, would first make the indorsements on the

bonds, and supposing from the defendant's declarations that no execution could be issued until the indorsements were made on them, they agreed to make them. The defendant admits in his answer that he did refuse; but he assigns a reason for it And we think he had a perfect right under the circumstances to refuse without assigning any reason; because the law accorded to him the right to remain passive, or to proceed against Clements, or against the sureties, or against both, at his option. After fully considering the subject, we think the complainant has failed to show any undue concealment on the part of the defendant, or that the sureties were taken by surprise, or were misled. On the contrary, we think it manifest from the evidence, that the complainant and his co-sureties were fully cognizant of all the facts really affecting their interests, which it was at all material for them to know, and that in executing the agreements indorsed on the bonds, they acted advisedly and with due deliberation. We, therefore, consider that the chancellor did right, in refusing to disturb the said agreements.

And here we might close the case. Because, we consider that as between the defendant and the sureties, the indorsements on the bonds amounted to an appropriation by the sureties themselves, of the payments made by Clements;—an appropriation just in itself toward the defendant, and which cannot in the end, operate unjustly toward any of the sureties, since they have taken the wise precaution of providing by a special agreement for the equitable adjustment of their respective liabilities as between themselves. But it is said that the defendant should have discharged Clements immediately on the discovery of his defalcations, and that having failed to do so, the sureties were thereby discharged from their liability on the bond. We do not think so. We know of no decision, or rule of law, requiring the defendant to discharge Clements on discovering his defalcation. They guaranteed his faithfulness and honesty in the discharge of his duties. The bond was given for the express purpose of

protecting the defendant against the consequences of his defalcation. Their contract was essentially a pledging of themselves and their estates, to make good any and every misfeasance or nonfeasance of their principal, during the whole time he should hold the office, to the extent of the penalty of the bond. It was no part of the contract that the defendant should discharge him immediately upon his failure to pay over the money in his hands. Moreover, the sureties suffered no detriment by his continuance in office; in fact, they were benefited. He reduced the amount of his indebtedness. Nothing less than fraud, actual or constructive, on the part of the defendant, could relieve them from their responsibitily. *U. S. vs. Kirkpatrick,* 9 *Wheaton* 720. *U. S. v. Vanzant,* 11 *Wheaton,* 184. *Sailly v. Elmore,* 2 *Paige* 500.    *McLemore v. Powell,* 12 *Wheaton* 554. We freely concede the correctness of the general doctrine that the contract of a surety should be construed strictly, if by strictly is meant that the liability of a surety shall not by implication, be extended beyond the fair scope of the terms of his contract. Indeed, the doctrine is so obviously founded in reason, as to need no authority to support it. But at the same time that we say this, we confess our inability to comprehend how the doctrine can affect the right of the defendant to recover under the ten thousand dollar bond. There can be no doubt of the existence of a defalcation on the part of Clements to the extent of $11,520.57 and upward. There can be as little doubt that this defalcation extended to both bonds, and that the penalties of both bonds were forfeited. There can, we think, be no shadow of question that the bond for $10,000 extended to and covered all taxes assessed and collected under the act of July 1st, 1862, whether the same were collected before or after the act of June 30th, 1864. But whether that bond can be held to extend to taxes assessed and collected under the act of June 30th, 1864, is a question which we do not think it material for us to consider in this case. Nor have we deemed it necessary to go into a critical exami-

nation of the accounts to ascertain the exact amount due on each bond, because, as already stated, we consider that, as between the defendant and the sureties, the sureties themselves have settled the matter of appropriation by their indorsements on the bonds, and have provided by their concurrent agreement for the final adjustment of their respective liabilities upon them. Still, we may say that it seems to us after a cursory examination of the accounts, that the amount of defalcation for taxes assessed under the act of July first 1862, will be found to be not very far from the sum indorsed by the sureties as being due on the ten thousand dollar bond. But, inasmuch, as all the authorities bearing on the question of the appropriation of payments have been cited, and the question itself has been elaborately discussed, and, as the counsel for the complainant have earnestly contended that the apportionment of the defalcation between the two bonds as thereon indorsed, is unjust and contrary to the settled rules of law respecting the appropriation of payments, it is, perhaps, proper that we should state, at least briefly, what we understand to be the present state of the law on this question.

The general rules upon the subject are these : If there be several debts due from a person, and he pays money to his creditor, the debtor has a right to appropriate the payment to which debt he pleases. But he must make the appropriation at the time he makes the payment, and he cannot make it afterward. If no specific appropriation be made by the debtor at the time of payment, then, the right of appropriation is devolved upon the creditor, and he may make it in any way he may think proper, and at any time before an account is settled between them, or before action brought; provided that such appropriation is not manifestly inequitable in respect to third persons. It is true, the decisions are conflicting as to the time when the creditor must make the appropriation, but the rule, as just stated, may now be considered as settled by the weight of authority, both in England and in this country.

68

*Simpson v. Ingham*, 2 *Barn. & C.* 65.    *Philpot v. Jones*, 2 *Ad. & Ell.* 41.    *Mills v. Fowkes*, 5 *Bing. N. S.* 455.    *Bosanguet v. Wray*, 6 *Taunt.* 597.    *Mayor of Alexandria v. Patton*, 4 *Cranch* 320.    *Fields v. Holland*, 6 *Cranch* 27.    *Stone v. Seymour*, 15 *Wend.* 19.    *U. States v. Jones*, 7 *Howard* 689. If no appropriation be made by either party, then, the payment must be applied as the law directs.    Mr. Justice Story, in the *U. S. v. Kirkpatrick*, 9. *Wheat.* 737, states the proposition rather differently.    He says, "the law will apply the payments according to its own notions of justice." And in *Cremer v. Higgenson et al.*, 1 *Mason* 323, he says the law will apply the payment according to its own notion of the intrinsic justice and equity of the case.    Another rule appliable to indefinite payments deduced from the case of *Devaynes v. Noble et al.*, 1 *Merivale* 605, known as *Clayton's Case*, which was decided by Sir William Grant in the year 1816, is, that if neither party makes the appropriation, the law will apply the payment to the discharge of the several items of the account in the order of their priority, the first item on the debit side of the account, being the item discharged or reduced by the first item on the credit side of it.    Now, where there is a single running account between the same parties in which third persons are not interested, the application of this rule is certainly well enough, for it will apply the payment according to the justice of the case.    *Clayton's Case* was a case of a running account and indefinite payments, and the rule applies to just such cases.    There is nothing in the case to warrant the assumption that Sir William Grant intended to lay it down as an inflexible rule, applicable alike to all cases. Moreover, the case itself did not necessitate the annunciation of such a rule.    There had been an account drawn out and delivered to Clayton showing the appropriation of the payments, to which he made no objection, and the report of the master states that the silence of Clayton after the receipt of his banking account, was regarded as an admission of its correctness.    "Both debtor and creditor must, therefore," says Sir William Grant, "be considered as

having concurred in the appropriation." So that, it is apparent from the case that the appropriation had really been made by the parties themselves. The rule in itself is sound enough. It is its application to cases never contemplated by Sir William Grant, that is objectionable. And it seems clear to us that whenever there are intervening equities in favor of third persons, the true doctrine is that the law will apply the payments according to its own notion of the intrinsic justice and equity of the case. We have said that the rule in *Clayton's Case* is not an inflexible rule. In the case of *Lysaght v. Walker*, 5 *Bligh N. S.* 1, decided in 1831, Lord Tenterden, who delivered the opinion of the House of Lords, declared that there was no inflexible rule which necessarily required subsequent payments to be applied in payment of the first item of the account, when different interests were concerned. In *Stone v. Seymour* 15. *Wend.* 33, decided in 1835, Chancellor Walworth, who delivered the opinion of the Court of Errors, declared as the result of his examination of the authorities in cases of indefinite payments "made on account of public moneys received and placed in general account by the officers of the Treasury, or the Controller, from time to time, without any specific appropriation thereof, and the accounts have not been stated and settled after the receipt of such payments, and where no intention was manifested by the debtor as to the application of the money, such general payments are not necessarily to be applied to the first item of charge on the debit side of the account, but they may thereafter be appropriated according to equity." And Senator Tracy thought that an inflexible application of the rule would be inconsistent with equity and reason. In the case of *The Postmaster General v. Norvil*, 1 *Gilpin* 125, tried in the year 1829, it was ruled that a debtor could not appropriate a payment in such manner as to affect the relative liabilities or rights of his different sureties without their consent.—That where a public officer has given successive official bonds with different sureties, moneys received subsequent to the execution of the latter cannot, before it is discharged, be applied to the

payment of the former.   And that where a public officer
has given different bonds with different sureties, his pay-
ments must be so appropriated as to give each bond credit
for the money respectively due and collected and paid un-
der it.   The learned Judge Hopkinson, who tried the
cause, after stating the general doctrine of the appropria-
tion of payments, proceeds to say, "There can be no ob-
jection to this doctrine where no party is concerned but
the debtor and creditor.   But how is it in a case like the
present?   Here a public officer in the receipt of public
money, has given security for the faithful performance of
his duties, and for the accounting for and payment of all
the moneys which shall come to his hands.   The sureties
remain for several years, and then a new bond with new
sureties is given, at which time there is a large sum of
money actually due to the public, and for which the sure-
ties on the first bond were liable, that is to say, the penal-
ty of the first bond was actually forfeited, and the amount
of the defalcation due and recoverable from the sureties
in it.   Can the government for whose security both bonds
were given, apply the money collected by the officer after
and under the second bond, and on the responsibility of
the sureties in the second bond, to the payment or credit
of the balance due on moneys collected, and which ought
to have been paid under the first bond?   Can the burden
actually resting on the first sureties—can the forfeiture
actually incurred by them, be shifted by the process of
appropriation without the consent or knowledge of the
second sureties, from the shoulders of the first and be put
upon the second?   I am of opinion, most clearly, that it
can not;—and that each set of sureties must answer for
its own defaults, and is entitled to · be credited with its
own payments.   If authority can be required to sustain
a principal of such obvious justice, it will be found in
the case of the *United States v. January,* 7 *Cranch* 572."
Following this, we have in the year 1833, the case of the
*United States v. Eckford's Executors,* 1 *Howard* 261, which
was the case of a public officer, who had given different
official bonds, at different times, with different sets of

sureties. Mr Justice McLean who delivered the opinion of the court, says, " the rule as to the appropriation of payments by debtor or creditor in the ordinary transactions of business, is earnestly relied on as applicable to the present case. And all the leading authorities on the subject are referred to. In the case of *Devayne v. Noble* (*Clayton's Case*) 1 *Mer.* 606, which governs the application of payments, was elaborately considered. But the applicability of this doctrine is not admitted. We think the rule established by this court in the case of the *United States v. January and Patterson*, 7 *Cranch* 572, is the true one." Then, we have in the year 1849, the case of *Jones v. the United States*, 7 *Howard* 688, in which it is declared by the court that, " In instances of official bonds executed by the principal at different times with different and distinct sets of sureties, this court has settled the law to be that the responsibility of the separate sets of sureties must have reference to, and be limited by, the periods for which they respectively undertake by their contract, and that neither the misfeasance nor nonfeasance of the principal, nor any cause of responsibility occurring within the period for which one set of sureties have undertaken, can be transferred to the period for which alone another set have made themselves answerable. Such is the rule established in the cases of *U. States v. January & Patterson, and U. States v. Eckford's Executors.*" We shall not attempt to reconcile either the real, or apparent discrepancies or conflict in the decisions on this subject. We consider that the supreme court of the United States in the cases of the *United States v. January & Patterson*, the *United States v. Eckford's Exec'rs*, and *Jones v. the United States*, just referred to, have finally settled the law as to the appropriation of payments where different sets of sureties are concerned,—we say finally settled the law, because whatever is settled right, upon just principles, should be held to be settled forever. We fully agree with the Chancellor in all his conclusions, and therefore are of opinion that his decree in this case should be affirmed in all respects.